# Illinois Official Reports

## Supreme Court

---

**People v. Patterson, 2014 IL 115102**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RONALD PATTERSON, Appellee. |
| Docket No. | 115102 |
| Filed | October 17, 2014 |
| Rehearing denied | January 26, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a case in which a 15-year-old made a station-house confession and, after a transfer to criminal court, was convicted by a jury of three counts of aggravated criminal sexual assault, the appellate court should not have found the confession involuntary and ordered a new trial where the totality of circumstances showed that, although the conduct of police may not have been exemplary, they made a reasonable attempt to notify a concerned adult as required by statute and the conduct of the detective assigned as a youth officer was not improper—challenge to constitutionality of automatic transfer statute rejected. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Ellen Beth Mandeltort and the Hon. Thomas P. Fecarotta, Judges, presiding. |
| Judgment | Appellate court judgment reversed.<br>Cause remanded. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Annette Collins and Douglas P. Harvath, Assistant State's Attorneys, of counsel), and Hannah J. McKinney, law student, for the People.

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Christopher Kopacz, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, and Molly McPartland and Brad Kaye, law students, for appellee.

Scott F. Main and Julie L. Biehl, of Chicago, for *amicus curiae* Children & Family Justice Center *et al.*

Joshua A. Tepfer, Molly Hall and Tara Thompson, of Chicago, and Molly Wyler, law student, for *amicus curiae* Center on Wrongful Convictions of Youth *et al.*

Justices

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.
Justice Theis dissented, with opinion.

**OPINION**

¶ 1    Defendant was 15 years old when he was charged with three counts of aggravated criminal sexual assault. Pursuant to the Illinois automatic transfer statute (705 ILCS 405/5-130 (West 2008)), his case was transferred from juvenile court to criminal court, where defendant was tried as an adult, convicted by a jury of all three counts, and sentenced to a total of 36 years in prison. On appeal, the appellate court reversed defendant's convictions and remanded the cause for a new trial, holding that the circuit court of Cook County had erred by admitting defendant's confession. 2012 IL App (1st) 101573. The court also concluded that evidence of the victim's sexual history was admissible on remand under the "constitutional necessity" exception to the state rape shield statute (725 ILCS 5/115-7(a) (West 2008)).

¶ 2    Before this court, the State argues that the appellate court erred by excluding defendant's confession and finding that evidence of the victim's sexual past was admissible on remand. Defendant filed a cross-appeal, contending that his confession was also inadmissible because his trial counsel provided ineffective assistance during the pretrial suppression hearing, an issue not reached by the appellate court. Defendant also challenges the constitutionality of

the automatic transfer provision (705 ILCS 405/5-130 (West 2008)) and asserts that his sentence was excessive. We reverse the appellate court's exclusion of defendant's confession and determination that evidence of the victim's sexual history is admissible under an exception to the rape shield statute, reject his ineffective assistance claim, and uphold the constitutionality of the automatic transfer statute. Finally, we remand the cause to the appellate court for its initial consideration of defendant's excessive-sentence claim.

¶ 3                                I. BACKGROUND

¶ 4      Defendant Ronald Patterson was a 15-year-old ward of the State of Illinois living in a residential treatment facility when he committed a violent sexual assault on a 25-year-old staff member, E.C. While E.C. was driving defendant home from a weekend family visit, he forced her to pull the facility van into a deserted parking lot off the highway, where the assault occurred. After the assault, the victim returned to the facility with defendant. Once defendant was secured in his unit, the victim immediately reported the attack, and the police were called.

¶ 5      Defendant was charged in Cook County circuit court with three counts of aggravated criminal sexual assault. His case was automatically transferred to criminal court, and he was tried as an adult, as required by statute (705 ILCS 405/5-130 (West 2008)). On defense counsel's motion, a fitness examination and hearing were held. At the hearing, both parties stipulated to the testimony of the examining psychiatrist, Dr. Nishad Nadkarni. Dr. Nadkarni found that defendant understood the charges against him, the court proceedings, and the role of court personnel. Dr. Nadkarni concluded that defendant was sane when the offenses were committed and did not suffer from a mental impairment limiting his ability to appreciate the criminality of his actions or to understand his *Miranda* rights. Defendant was able to define each of those rights accurately and was able to assist his trial counsel and behave appropriately in court. The trial court subsequently found defendant fit to stand trial without medication.

¶ 6      Defendant next filed a motion to suppress his inculpatory statement to the police, arguing that the police youth officer did not contact defendant's legal guardian, the Illinois Department of Children and Family Services (DCFS), before he was interviewed and did not "affirmatively" protect his rights. The motion also claimed his statement was involuntary because he was a special education student with limited reading skills and comprehension who was not given his *Miranda* rights before questioning. The motion did not allege, and defense counsel expressly denied, "any type of coercion or duress" by the police.

¶ 7      At the suppression hearing, several witnesses testified, including the residential treatment facility director, Stephen Kehoe. Kehoe stated that he spoke to two or three police officers the night defendant was taken into custody at the facility at approximately 8:30 p.m. on Sunday, December 14, 2008. Kehoe could not remember whether any of the officers asked him for permission to speak to defendant, and he denied possessing sufficient authority to grant permission, asserting that DCFS alone retained that authority. Kehoe did recall, however, officers obtaining the name and phone number of defendant's DCFS caseworker the night defendant was taken into custody.

¶ 8      Detective Joe Kaminski also testified at the suppression hearing. He stated that he was the youth officer assigned to defendant's case and knew defendant was a resident of the

treatment facility. After arriving at the police station on the night defendant was taken into custody, Detective Kaminski briefly spoke to E.C. before talking to defendant. Kaminski inquired about defendant's grade in school but did not inquire about his participation in special education classes. Detective Kaminski stated he called both Kehoe and defendant's caseworker shortly before 10 p.m. to notify them that defendant was at the Schaumburg police station and was going to be questioned about the assault. When they could not be reached, Kaminski left voicemail messages for them. Defendant's caseworker did not return his call for two days. Nonetheless, Kaminski confirmed with another officer prior to the start of questioning that Kehoe had been notified that defendant had been taken to the police station and that Kehoe had given the police permission to speak to defendant. Detective Kaminski testified at trial that after defendant was questioned he again called Kehoe, who confirmed that the police had permission to speak with defendant as well as to search the facility's van for evidence.

¶ 9 Kaminski described the role of a youth officer as advising defendant of his rights and ensuring his understanding, as well as answering defendant's questions. Before the police interview, Detective Kaminski explained to defendant why he was at the station and read his *Miranda* rights to him from a preprinted form at about 10 p.m., asking defendant to explain each right in his own words. Defendant stated that he understood his rights and accurately described each of them. The officer had defendant read the form waiving his rights aloud, initial each sentence, and sign the form. The record does not indicate that defendant either asked to speak to another adult or made any other request prior to the start of questioning.

¶ 10 A second detective, John Atamian, then interviewed defendant for about 45 minutes about the alleged assault. Although Detective Kaminski remained in the room during questioning, he did not participate. After the interview was over and defendant's statement was typed, it was read to defendant, who did not make any corrections. Defendant then read the statement aloud and signed it at 11:15 p.m.

¶ 11 Defendant's account of the events differed significantly. According to him, after he had been at the Schaumburg Police Station for 30 to 45 minutes, the youth officer asked him if he needed anything and questioning began shortly thereafter. He claimed he did not receive any *Miranda* warnings until the interview was over and he had signed a typewritten statement. He also asserted he did not read the statement before signing it. During the suppression hearing, defendant did not claim that he had been threatened, mistreated, or coerced by the police, that he failed to understand the interrogation process, that he had asked to speak to another adult, or that he was a special education student with trouble reading and writing.

¶ 12 The trial court denied defendant's motion to suppress his statement, finding both that the youth officer had fulfilled his duty and that it was reasonable for the police to notify the residential facility director of defendant's arrest as he was a state ward and the facility "has been run under the supervision of [DCFS]. So it would be reasonable to assume that the director has some authority to act on behalf of DCFS. Particularly over people that are residents in his residence hall that he directs." The judge also provided general remarks addressing his observations during the hearing, noting that it was "curious" that Kehoe's counsel attempted, but was not permitted, to sit in the witness box with him and describing Kehoe's inability to recall whether he gave the police permission to interview defendant as

"interesting." In addition, the judge noted that Kehoe never denied giving his permission despite admitting that he had talked to three different officers that night.

¶ 13     The trial court expressly found Detective Kaminski's testimony to be "very credible" and emphasized that he had not participated in defendant's questioning, while rejecting as "ludicrous" defendant's claim that he had not been read his *Miranda* rights until after he signed the written statement. The court concluded that defendant's rights had been properly protected during questioning and that the police were not required to suspend their investigation until defendant's caseworker was notified "because then they would be criticized for sitting on him for days." In denying the suppression motion, the court found that defendant understood his rights when he signed the waiver form, and that, under "the totality of the circumstances," his confession was voluntary.

¶ 14     The case proceeded to trial. The victim testified that defendant grabbed her arm and forced her to take the next exit off the highway as she was driving him back to the facility after his weekend family visit. At the time of the assault, defendant was 5 feet 10 inches and weighed between 250 and 300 pounds, while the victim was 5 feet 2 inches and weighed 115 pounds. After taking the exit, defendant directed her to park in an empty lot in an industrial area and give him the keys to the van. She managed to retain the keys and reached inside her purse for her cell phone to call the facility for help, but defendant knocked the phone from her hand. Throughout the assault, defendant told the victim not to make him hurt her, and she testified that she feared for her life. She initially attempted to escape by opening the driver's side door and stepping out of the van, but defendant grabbed her coat and followed her out of the vehicle. While returning the victim to the van, defendant pinned her against its sliding door, holding her by the front of her neck as he opened the sliding door and shoved her inside. She immediately tried to escape again, this time through the other sliding door, but defendant caught her by the foot and pulled her back. At some point, the victim's global positioning system (GPS) was damaged, and the frayed cord fell onto the parking lot, where it was later found by police.

¶ 15     Once back inside the van, defendant told the victim to remove her clothing. When she refused, he forcibly removed her boots and jeans. He then ordered her to perform oral sex, pushing her head down while gripping her by the hair and the back of her neck. He grabbed the front of her neck and choked her until she opened her mouth. After 20 or 30 seconds, defendant briefly stopped before choking her again as he forced her to perform the act a second time. Next, defendant performed oral sex on the victim before engaging in vaginal intercourse for 30 or 45 seconds. Throughout this time, defendant appeared nervous and kept looking over his shoulder.

¶ 16     Shortly after that, he apologized and said he did not want to get in trouble. The victim promised she would not tell anyone what happened, and he allowed her to dress. They retrieved her cell phone as well as other items that had fallen out of her purse before she drove the van back to the residential facility, arriving at about 6:30 p.m.

¶ 17     On the way into the facility, they passed one of the victim's co-workers, and, after defendant was secured behind locked doors, the victim ran back to her co-worker and collapsed, sobbing. The co-worker carried the victim to the supervisor's office, and the police were called. The victim was taken back to the site of the assault before being examined at a

hospital. She reported experiencing pain in her genital area and finding it very difficult to get out of bed the next day.

¶ 18     The emergency room physician who performed the sexual assault examination testified for the State. He had treated about 100 sexual assault victims and was qualified as an expert in emergency medicine. In his medical report, he noted redness, abrasions, and a number of fresh bruises on the victim's left thigh, wrist, elbow, and waist or hip. An external genital examination failed to reveal any injuries, a finding the physician explained was not unusual. An internal examination, however, revealed some cervical redness. The physician was unable to attribute the redness to a sexual assault. On cross-examination, the physician was unable to identify *any* specific source of the redness.

¶ 19     The parties stipulated that the forensic report stated, "No DNA of Ronald Patterson was found in the vaginal swab collected from [the victim]." During a subsequent sidebar, defense counsel requested permission to question the doctor about the presence of DNA (deoxyribonucleic acid) from someone other than defendant, indicating that the victim "had recent intercourse, with someone else within 72 hours, knowing how far—that's about how long sperm last." Counsel did not make an offer of medical proof about how long cervical redness would have been present after consensual intercourse. The State objected to the questioning, arguing the additional questions would violate Illinois's rape shield law, generally barring, in relevant part, any examination of the victim's prior sexual history with persons other than the defendant. The State argued that the DNA found was from the victim's boyfriend three days before the assault and did not provide a basis for granting defendant's request. The trial court barred defendant from eliciting testimony about the victim's prior activity to explain the redness because the physician "did not even trace it back to this incident" and "did not say it was the result of a rape." After the sidebar, defense counsel did not make any additional inquiry about cervical redness or its potential persistence.

¶ 20     The investigating officers testified that the frayed cord to the victim's GPS unit was discovered in the parking lot where the assault occurred, while the GPS charger was still inside the vehicle. In addition, the passenger side sun visor was torn from the ceiling and found on the driver's side floor. The side of the van was dirty, with visible smudges and vague handprints outside the driver's side door where defendant pinned the victim after she tried to escape.

¶ 21     Detective Kaminski testified at trial, recounting portions of his suppression hearing testimony and adding that he arrived at the residential facility around 9:15 p.m. and spoke to the victim before she went to the hospital. He asserted that, as a trained youth officer, his "responsibility was to first and foremost explain to [defendant] why he was at the Schaumburg Police Department. After we got past that, then it was to read him his *Miranda* warnings and to make sure that he understands what his *Miranda* warnings were." He determined defendant's age, that defendant had lived at the residential facility for three years, and that he was in ninth grade and could read. Detective Kaminski indicated it was not his "job to give advice" to defendant and that he "made a reasonable attempt" to contact defendant's guardian before the interview began.

¶ 22     The officer who questioned defendant also testified at trial, stating that defendant, who was not handcuffed at the time, gave two conflicting accounts of the incident. In the first account, defendant claimed that the victim initiated the encounter, and he denied that

intercourse occurred. He also denied leaving the van while it was in the parking lot. When the officer said he would check for surveillance footage from the surrounding buildings, defendant's demeanor changed suddenly. His shoulders slumped, he hung his head, and he disclosed that he had not been telling the truth. He then admitted committing the assault, stating he had not meant to hurt the victim but had gotten angry because he had not taken his medication. Defendant's second statement was typed and read aloud before he signed it. The statement noted that defendant was not threatened, coerced, or promised anything in return, and his signature acknowledged that the statement was true, accurate, and voluntarily made and that he previously had an opportunity to review and edit it.

¶ 23    Defendant testified in his own defense and refuted the inculpatory statements in the confession. He asserted that the incident was consensual, without any struggle. He testified that the victim simply exited the highway and parked in the lot without any explanation before asking him to get into the backseat of the van. After he complied, she unzipped his pants and performed oral sex for a few minutes before telling him it was time to return to the facility. She told him that if he did not say anything, she would not either. They then returned to the front seats, and the victim drove back to the facility. Defendant returned to his room, and Director Kehoe and defendant's therapist later came to get him from the dayroom and take him to the lobby, where the police were waiting.

¶ 24    Defendant also described his interrogation at the police station, reiterating that he was not given *Miranda* warnings until after the questioning. He denied knowing how the van or the GPS unit was damaged or how the victim was injured. He also asserted that the police lied about his confession. He maintained that he did not give the account memorialized in the statement and that he was instructed to sign before reading it or receiving any *Miranda* warnings.

¶ 25    To advance defendant's consent defense, counsel questioned the victim's credibility during closing argument, asking the jury to consider why the victim was "wearing elastic jeans that come down easily that might fall, and she doesn't have any underwear on" while working with teenage boys. He also asserted that the source of the cervical redness was never established and emphasized the absence of any DNA from defendant to raise questions about the validity of the victim's story. Finally, counsel argued that the validity of defendant's confession was suspect because it was not videotaped and the police should have "wait[ed] until Monday to get his guardian."

¶ 26    After deliberating almost nine hours over two days, the jury found defendant guilty on all three counts of aggravated criminal sexual assault, and he moved for a new trial, contending that the police had not provided proper notice to his legal guardian. The trial court denied the motion because "the police did make reasonable efforts to find a guardian," assigned a youth officer, and gave defendant "appropriate" *Miranda* warnings that he understood.

¶ 27    Defendant's motion for a new trial also alleged that the court erroneously denied his request to ask about the victim's sexual history to suggest an alternative explanation for the cervical redness. He contended that the additional questions were necessary because the jury may have assumed the redness was caused by defendant if they did not know her boyfriend's DNA had been found. The State countered that defendant had extensively cross-examined the emergency room physician and had been allowed to present his theory of the case adequately. The trial court denied defendant's motion for a new trial.

¶ 28     During sentencing, evidence was presented that defendant had been exposed to cocaine before birth and taken into DCFS custody as an infant before being adopted by another family member. He had a long history of aggressive and violent behavior toward both his family and others that resulted in several admissions to mental hospitals with widely varying diagnoses, including depression, intermittent explosive disorder, oppositional defiant disorder, bipolar disorder, and attention deficit hyperactivity disorder. In 2006, his adoptive family voluntarily gave up custody to DCFS based on defendant's aggression and mental health needs.

¶ 29     The State's aggravating evidence included a victim impact statement and reports of defendant's aggressive and violent behavior both toward residents and staff at the treatment facility and while he was in custody awaiting trial. Defendant offered mitigating letters and testimony requesting leniency due to his age, difficult childhood, and mental health issues. After considering all the relevant factors, as well as defendant's potential for rehabilitation and the fact that he did not meet the statutory criteria for mental retardation, the trial court sentenced defendant to three consecutive 12-year prison terms. The court subsequently denied defendant's motions for a new trial and to reconsider the sentence.

¶ 30     On appeal, defendant argued that the trial court's denials of his suppression motion and defense counsel's request to introduce the victim's sexual history were erroneous. He also claimed defense counsel was ineffective for failing to offer evidence of his mental impairment at the suppression hearing to establish the involuntary nature of his confession. Finally, defendant contended that his sentence was excessive.

¶ 31     The appellate court reversed defendant's convictions and remanded the cause for a new trial, finding that his confession should have been suppressed because defendant's parents or another concerned adult had not been contacted before questioning and Detective Kaminski's actions conflicted with his role as defendant's youth officer. 2012 IL App (1st) 101573, ¶¶ 37-39 (modified upon denial of rehearing Sept. 26, 2012). The court did not address defendant's claim that his trial counsel had been ineffective, however, instead initially "tak[ing] into consideration Patterson's severely limited intelligence and education" in its *de novo* review of the suppression issue. 2012 IL App (1st) 101573, ¶ 35 (modified upon denial of rehearing Sept. 26, 2012). The court also addressed the merits of defendant's rape shield claim, concluding that the trial court erred in excluding evidence of the victim's sexual history. 2012 IL App (1st) 101573, ¶ 45 (modified upon denial of rehearing Sept. 26, 2012).

¶ 32     The State filed a petition for rehearing, and the appellate court modified its opinion to eliminate any consideration of defendant's "severely limited intelligence and education," but it still did not directly rule on defendant's ineffective assistance claim. 2012 IL App (1st) 101573, ¶ 35 (modified upon denial of rehearing Sept. 26, 2012). Applying a *de novo* standard of review, the appellate court again suppressed defendant's typewritten confession as involuntary, based on the same rationale it used in its original opinion. 2012 IL App (1st) 101573, ¶¶ 38-40 (modified upon denial of rehearing Sept. 26, 2012). Based on this disposition, the court did not reach the merits of defendant's excessive sentence claim.

¶ 33     This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). We also permitted *amicus curiae* briefs to be filed by the Center on Wrongful Convictions of Youth *et al.*, and by the Children and Family Justice Center *et al.* Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

II. ANALYSIS

Before this court, the State's appeal raises two issues: (1) whether the appellate court erred in suppressing defendant's confession by concluding that: (a) a concerned adult was not contacted pursuant to section 5-405(2) of the Juvenile Court Act of 1987 (705 ILCS 405/5-405(2) (West 2008)); and (b) the police youth officer improperly participated in defendant's interview; and (2) whether the trial court properly applied the Illinois rape shield statute (725 ILCS 5/115-7(a) (West 2008)) in denying defendant's request to introduce evidence of the victim's sexual history. In his cross-appeal, defendant presents two additional issues: (1) whether defense counsel provided ineffective assistance by not offering evidence of defendant's diminished mental capacity during the suppression hearing; and (2) whether the mandatory transfer of certain minors from juvenile court to adult criminal court under the relevant portion of section 5-130 of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2008)) is constitutional under the due process clause, the eighth amendment, and the Illinois proportionate penalties clause, particularly in light of the United States Supreme Court's rationale in *Roper v. Simmons*, 543 U.S. 551 (2005) (abolishing the death penalty for all juveniles), *Graham v. Florida*, 560 U.S. 48 (2010) (barring life without parole for juveniles in nonhomicide cases), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012) (barring mandatory life without parole for all juveniles).

## A. Suppression of Defendant's Confession

In its appeal, the State initially argues that the appellate court erred in holding defendant's motion to suppress his confession should have been granted. The State specifically refutes two of the court's findings: (1) the police did not make a sufficient effort to notify a concerned adult under section 5-405(2) (705 ILCS 405/5-405(2) (West 2008)); and (2) the youth officer improperly participated in the investigation. In his cross-appeal, defendant asserts an alternative rationale for upholding the appellate court's determination. He argues that his trial counsel provided him with ineffective assistance at the hearing on the suppression motion. Although we review *de novo* the ultimate question of whether defendant's confession was voluntary after examining the totality of the circumstances, we examine the trial court's underlying factual findings deferentially, overturning them only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 50, 54 (2000).

### 1. *The Statutory Notice Requirement*

In examining whether the police complied with section 5-405(2), we look first to the relevant portion of the statutory language:

> "(2) A law enforcement officer who arrests a minor without a warrant under Section 5-401 shall, if the minor is not released, immediately make *a reasonable attempt* to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held ***." (Emphasis added.) 705 ILCS 405/5-405(2) (West 2008).

The key to resolving the question in this case is the reasonableness of the Schaumburg police department's actions before defendant was questioned. The appellate court concluded

that those actions did not constitute a "reasonable attempt" to contact a concerned adult, and defendant emphasizes that the presence of a "concerned adult" before or during the interrogation is an "important element" in determining the voluntariness of his confession (*People v. Griffin*, 327 Ill. App. 3d 538, 545 (2002)).

¶ 41    The parties agree that youth officer Kaminski called both the director of defendant's residential facility, Stephen Kehoe, and defendant's caseworker to notify them that defendant was at the Schaumburg station and was going to be questioned about the assault shortly before questioning began at 10 p.m. When they could not be reached, Kaminski left voicemail messages for each of them. The State notes that defendant's caseworker did not return Detective Kaminski's call for two days. The trial court acknowledged this fact as well, stating the police did not need to stop the investigation and "sit on the Defendant for days because then they would be criticized for sitting on him for days."

¶ 42    In addition, Kaminski testified that he established with another officer prior to the start of questioning that Kehoe had previously been told where defendant was taken and had given the police permission to speak to defendant. Detective Kaminski further testified that, after defendant was questioned, he again called Kehoe, who confirmed that the police had permission to speak with defendant as well as to search the facility's van for evidence.

¶ 43    In its evaluation of the witnesses, the trial court noted that Kehoe did not deny giving permission and admitted he had spoken to three police officers that night, although he was unable to recall giving his permission. The judge appeared somewhat skeptical of Kehoe's lack of memory, describing the lapse as "interesting" and finding it "curious" that Kehoe's counsel attempted, but was not permitted, to sit in the witness box with him during questioning. In contrast, the judge "believe[d] Officer Kaminski," describing his testimony as "very credible." Due to the inherent limitations in reviewing a cold transcript, we must give the trial court's credibility findings considerable deference. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007).

¶ 44    While Detective Kaminski undoubtedly could have taken additional steps to notify a concerned adult, such as seeking out and calling the caseworker's home phone number, none of those steps are required by the statute. 705 ILCS 405/5-405(2) (West 2008). Statutory compliance is solely dependent on the police making a "reasonable attempt" at notification, not on perfect performance. In this instance, defendant was taken into custody at approximately 8:30 p.m. on a Sunday. Detective Kaminski testified that he attempted to comply with the notice requirement by placing telephone calls to both the director of defendant's residential facility, Stephen Kehoe, and defendant's caseworker before defendant was questioned. When he was unable to reach either party, Kaminski left phone messages. Kaminski was also informed by another officer prior to the start of questioning that Kehoe already granted permission to question defendant, and Kehoe did not dispute that he may have given permission. Although the statute does not require permission to interview a juvenile defendant, a grant of permission establishes that actual notice was given, fulfilling the statute. In addition, Detective Kaminski testified he personally spoke to Kehoe after defendant was questioned but before his statement was typed, reviewed with him, and signed. The trial judge found Detective Kaminski to be a "very credible" witness, and nothing in the record refutes that assessment.

- 10 -

¶ 45    The reasonableness of the notification attempt by the police is also supported by the description of the persons subject to notification. Section 5-405(2) requires the police to make a reasonable attempt to notify "the parent or other person legally responsible for the minor's care or the person with whom the minor resides." 705 ILCS 405/5-405(2) (West 2008).

¶ 46    While DCFS was indisputably defendant's legal guardian, the person or persons who were "legally responsible for [his] care" during the years he lived at the treatment facility is less clear. Defendant contends that Kehoe was not an appropriate adult to contact because he did not work for DCFS. We need not definitively answer that question here, however, because our inquiry is limited to determining whether the police made a reasonable attempt to notify a proper person.

¶ 47    As the director of the treatment facility where defendant had resided for three years, Kehoe was at least arguably "a person with whom defendant resided," and bore some degree of responsibility for his care. Although defendant contends that Kehoe was more likely to be concerned for his injured staff member than for defendant, the plain language of the statute does not require that the individuals to be notified be concerned exclusively with the defendant's well-being, instead simply listing broad categories of potentially concerned adults.

¶ 48    Defendant emphasizes the absence of a concerned adult is particularly relevant if the police have prevented an adult from talking to a juvenile, citing *People v. Murdock*, 2012 IL 112362, ¶ 33. While we agree with that general statement, we disagree that it applies to the facts of this case. The record shows that Director Kehoe did not deny giving the police permission to speak with defendant, and the trial court appears to have been seriously troubled by his alleged lack of memory, particularly when he admitted he spoke with three police officers that night. Defendant does not cite any case law holding that a particular concerned adult was "prevented" from contacting a juvenile merely because another potentially concerned adult could not be contacted. The statute does not expressly require the police to attempt to contact every possible concerned adult, and in the absence of that legislative mandate, we decline to read that requirement into the statute. See *People v. Lewis*, 223 Ill. 2d 393, 403 (2006). Accordingly, we are not convinced that the police "prevented" any adult from contacting defendant under the facts of this case.

¶ 49    Defendant also contends that finding the police attempts at notification to be reasonable would defeat the purpose of obtaining a concerned adult. As enacted, the statute does not mandate the presence of a concerned adult or, even more critically, that actual notice be provided before the start of questioning. Section 5-405(2) simply requires that the police make a reasonable attempt to provide notification. 705 ILCS 405/5-405(2) (West 2008). This court may not add requirements to those already imposed by the plain language of the statute. *Lewis*, 223 Ill. 2d at 403. Therefore, based on our review of all the relevant facts, we conclude that the attempt here by police to provide proper notice, while arguably not exemplary, was sufficient to comport with the legislature's statutory mandate. Accordingly, we reverse the appellate court's contrary finding.

## ¶ 50   2. *The Role of the Youth Officer*

¶ 51   As an additional basis for reversing the denial of defendant's motion to suppress his confession, the appellate court concluded that youth officer Kaminski improperly participated in the criminal investigation and "did not even fulfill the most basic of a youth officer's tasks." 2012 IL App (1st) 101573, ¶ 38 (modified upon denial of rehearing Sept. 26, 2012). Before this court, defendant points to Kaminski's allegedly improper acts of talking to the victim upon his arrival at the police station and working with the questioning officer by helping to type defendant's statement, reading it to defendant, and obtaining his signature. Defendant analogizes these actions to those of the youth officer in *Murdock*, 2012 IL 112362, ¶¶ 50-51, who actively worked against the defendant's interests, completely abandoning his protective role by actively questioning the defendant about his involvement in the alleged offenses.

¶ 52   We concluded in *Murdock* that the juvenile officer "was not merely *** standing by while another officer took the lead in interviewing defendant; rather, [he] was the lead interviewer. *** [He] could not act as a juvenile officer or concerned adult while at the same time compiling evidence against defendant." *Murdock*, 2012 IL 112362, ¶ 51.

¶ 53   In contrast, Detective Kaminski was "merely a juvenile officer standing by while another officer took the lead in interviewing defendant" (*Murdock*, 2012 IL 112362, ¶ 51). Although Kaminski was present during the interview, defendant does not allege that he asked any questions. Moreover, Detective Kaminski fulfilled the fundamental duties of a youth officer noted in *Murdock*, such as inquiring whether defendant needed anything, ensuring that he was treated properly while in custody, reading defendant his *Miranda* rights (*Murdock*, 2012 IL 112362, ¶ 49), as well as ascertaining that he understood those rights by asking him to explain each one individually. Although defendant testified that he was not read his rights until after he signed a statement that had been fabricated by the police, the trial court found those allegations to be "ludicrous" and Kaminski's contradictory account to be "very credible." Defense counsel also specifically denied at the suppression hearing any allegation of coercion or duress by the police.

¶ 54   Even though Kaminski briefly spoke to the victim when he arrived at the police station, the record does not show what information he obtained at that time, and defendant does not establish how that conversation adversely affected his performance as a youth officer that night. Our review of the record also fails to reveal any connection between Kaminski's conversation and possible prejudice to defendant. Nor did Kaminski's ministerial acts of helping the investigating officer type up the statement and reading it aloud to defendant clearly breach the proper role of a youth officer. In fact, to ensure defendant's understanding of the contents of the statement, Kaminski took the additional step of having him read it aloud before signing it.

¶ 55   As we explained in *Murdock,* "[w]hile the presence of a juvenile officer is a significant factor in the totality of the circumstances argument, there is no requirement that a juvenile officer be present when a minor is questioned, and the absence of a juvenile officer will not make a juvenile's statements *per se* involuntary." *Murdock*, 2012 IL 112362, ¶ 52. Notably, despite the youth officer's complete abandonment of his duties, we ultimately concluded that the juvenile's statements were made voluntarily and upheld their admission at trial. *Murdock*, 2012 IL 112362, ¶ 55.

¶ 56    Here, Detective Kaminski's actions did not remotely approach the complete abandonment of his role as a youth officer. If the complete absence of a youth officer and the active, adverse participation of a purported youth officer in the questioning of a juvenile are not sufficient to mandate a finding that a statement is involuntary, then Kaminski's involvement does not either. Accordingly, we reject defendant's argument that the appellate court properly concluded that his statement was involuntary based on Kaminski's improper participation in the investigation.

¶ 57                              3. *The Totality of the Circumstances*

¶ 58    Next, we must examine the totality of the circumstances to determine *de novo* whether the trial court's denial of defendant's motion to suppress his statement was erroneous. In making that determination, we recognize that taking a juvenile confession requires great care to ensure it did not result from mere juvenile ignorance or emotion. *G.O.*, 191 Ill. 2d at 50, 54-55. Relevant factors to consider include the minor's age, mental capacity, education, physical condition, the legality and length of the interview, and physical or mental abuse by the police, as well as the presence of a concerned adult and any attempts by the police to prevent or frustrate that contact. *G.O.*, 191 Ill. 2d at 54-55.

¶ 59    Defendant argues that the appellate court correctly determined that his statement was involuntary due to the coercive atmosphere created by this combination of factors: (1) the absence of a concerned adult during questioning; (2) the insufficiency of police attempts to contact a concerned adult; (3) youth officer Kaminski's participation in the investigation; (4) defendant's youth and minimal criminal justice system experience; (5) the officers' use of trickery during questioning; and (6) the time when questioning was conducted.

¶ 60    In its modified decision, the appellate court relied heavily on the first three factors cited by defendant. Having previously found that the police did not violate the notice provision in section 5-405(2) and that Kaminski's conduct was not improper; however, we need not further examine those separate factors. *Supra* ¶¶ 48, 53-54. As for the fourth factor, defendant's youth and limited prior contact with the police, defendant alleged in his motion to suppress that he was "a special education student with limited reading comprehension and comprehension skills" but offered no supporting evidence at the motion hearing. The absence of that evidence serves as the basis for defendant's additional claim that trial counsel provided him with ineffective assistance, a question we will address later. For our present purpose of reviewing the propriety of the trial court's denial of the suppression motion, however, we consider only the evidence actually adduced at the suppression hearing.

¶ 61    We also note that defendant specifically disavowed at that hearing any police coercion or duress and does not allege any physical abuse or overt promises by police during questioning before this court. Thus, we examine only the remaining factors at issue in this case: (1) defendant's age; (2) his limited experience with the criminal justice system; (3) any possible police deception; and (4) the time, legality, and duration of the questioning. See *G.O.*, 191 Ill. 2d at 54-55.

¶ 62    Addressing the first two factors together, the record shows that defendant was 15 years old and in ninth grade when he was questioned by police. Although defendant had received a "station adjustment" from police when he was 11, he had no other contact with the criminal justice system. Based on his prior experience, defendant posits that the failure to tell him that

- 13 -

he was facing adult charges likely caused him to believe he would be allowed to go home if he cooperated by signing the confession. Defendant has never claimed, however, that the police promised him anything in exchange for his confession. Moreover, after viewing defendant's testimony at the suppression hearing, the trial court found him to be sufficiently mature to be capable of making a valid statement, describing him as:

> "a very astute young man. He is not in my opinion someone who does not understand things, his testimony, and his demeanor while testifying and so forth. I guess for lack of a better explanation from a judge's point of view is he looks and acts much, much older than his age. That's not saying that his mental state is older, but I don't see any reason in the record that or even outside the record that I saw after consideration of everything that I have heard to suppress this statement."

The trial judge had the distinct advantage of watching defendant testify, and his description of defendant's apparent maturity is not belied by our review of the record. Accordingly, we defer to the trial court's assessment. *Wheeler*, 226 Ill. 2d at 114-15.

¶ 63        Moreover, we have upheld the admission of statements obtained without the benefit of a concerned adult from defendants considerably younger and less experienced than defendant. In *G.O.*, the defendant was just 13 years old when he was adjudicated delinquent of first degree murder, aggravated discharge of a firearm, aggravated battery, and aggravated battery with a firearm. *G.O.*, 191 Ill. 2d at 40. The police contacted his mother, and, although she did not contact him prior to questioning, they did not frustrate any attempt to speak with him. *G.O.*, 191 Ill. 2d at 56. Despite his young age, we upheld the admission of his confession after reviewing the totality of circumstances that are nearly identical to those in this case. We weighed the defendant's youthfulness, lack of prior contact with law enforcement, and the absence of a concerned adult against the absence of any request to speak to an adult or evidence that the police frustrated any attempts at outside contact, the validity of the detention, the giving and understanding of the defendant's *Miranda* rights, his intelligence, the short duration of the questioning, the absence of handcuffs, the opportunities given to the minor for food, drink, and access to the bathroom, and the lack of any physical coercion, threats, or promises by the police. *G.O.*, 191 Ill. 2d at 56.

¶ 64        Defendant is also older than the minor in *People v. Morgan*, who was only 14 years of age when he was charged with the murders of his grandfather and grandmother, charges that ultimately resulted in a prison sentence of 75 years. *People v. Morgan*, 197 Ill. 2d 404, 410 (2001). The defendant had been an average student prior to being expelled from a private school for misconduct, although he had twice been hospitalized for over a month with diagnoses of attention deficit disorder and depression and had been prescribed antidepressants. Although he was handcuffed when initially taken into custody, the defendant was not restrained during questioning, nor was he threatened, coerced, or promised anything by police. *Morgan*, 197 Ill. 2d at 437-39.

¶ 65        This court was troubled most by the police department's complete failure to attempt to contact a concerned adult, or even a youth officer, prior to questioning, but we noted that the police did not actively prevent or frustrate contact and the defendant did not ask to speak to an adult. We also expressly recognized that a juvenile's confession should not be suppressed merely because he was denied an opportunity to confer with a concerned adult. *Morgan*, 197 Ill. 2d at 439-40 (citing *G.O.*, 191 Ill. 2d at 55).

¶ 66	The defendant in *Morgan* was offered food, drink, and bathroom access and was held in custody for less than six hours. *Morgan*, 197 Ill. 2d at 436, 439. He was read his *Miranda* rights before being subjected to two interviews of approximately 30 minutes each. Although the defendant claimed he did not understand those rights and felt he had no choice but to answer the officer's questions, the record showed that he affirmatively declined to answer one question. Consequently, we agreed with the trial court's factual finding that the defendant understood his rights and that his will had not been overborne when he confessed to the murders. Accordingly, we affirmed the trial court's denial of the defendant's motion to suppress his custodial statements. *Morgan*, 197 Ill. 2d at 441.

¶ 67	Finally, as in *Murdock*, 2012 IL 112362, ¶ 44, the instant defendant was "on the older end of the juvenile scale." In *Murdock*, the defendant was 16 years old when he was tried as an adult and convicted of first degree murder and aggravated battery with a firearm. *Murdock*, 2012 IL 112362, ¶ 3. The evidence established that the defendant received poor grades and had completed only one semester at an alternative high school before trial. On appeal, he argued that the trial court erred by denying his motion to suppress his statement as involuntary. *Murdock*, 2012 IL 112362, ¶ 28.

¶ 68	We concluded that the youth officer actively worked against the defendant's interests and that no other concerned adult was available to him prior to and during questioning. *Murdock*, 2012 IL 112362, ¶¶ 50-51. Nonetheless, after examining the totality of the circumstances, we affirmed the trial court's determination that his confession was voluntary and admissible. In reaching that conclusion, we looked at the defendant's lack of prior police contact, his demeanor and degree of understanding during questioning, his physical condition, his opportunities for food, drink, and bathroom use, and the absence of any coercion, physical or mental abuse, or promises or trickery by the police. *Murdock*, 2012 IL 112362, ¶ 55.

¶ 69	Notably, the length of the defendant's detention and interview in *Murdock* were both considerably longer than those of defendant in this case. Murdock was detained for six to seven hours and questioned for three hours, with the interview concluding before "the very early morning hours." *Murdock*, 2012 IL 112362, ¶ 47. Here, defendant was taken into custody at 8:30 p.m., and signed his statement at 11:15 p.m., after just 45 minutes of questioning.

¶ 70	Our decisions in *G.O.*, *Morgan*, and *Murdock* are highly instructive in this case, and we are not persuaded by defendant's attempts to distinguish *Murdock* and *G.O.* on their facts. He contends that *Murdock* is distinguishable because there it was "clear" that the juvenile's grandfather, who was at the police station, never requested to speak with him and the police officer testified contact would have been permitted if a request had been made. Here, the police allegedly questioned defendant "with full knowledge that no concerned adult would even know" he had been taken into custody, contributing to the coercive atmosphere present during questioning.

¶ 71	We reject defendant's argument for two reasons. First, Detective Kaminski testified that he was informed prior to the start of questioning that Director Kehoe had already given permission for the interview, and the trial court found his testimony to be highly credible. Thus, Kaminski would have reasonably believed a concerned adult had been notified and chose not to speak with defendant before questioning. Under those circumstances, the police could not have leveraged any possible advantage from withholding notice to a concerned

adult during questioning. Second, defendant's argument is logically inconsistent. The coercive effect of the lack of contact between a minor defendant and a concerned adult prior to questioning is the same regardless of whether it resulted from the failure of a concerned adult who was actually present at the police station to request contact, as in *Murdock*, or a lack of notice to any concerned adult at all, as defendant alleges here. Under either set of circumstances, the juvenile would still be subject to questioning without the benefit of a concerned adult's experience and insight.

¶ 72    Defendant also attempts to distinguish *Murdock* because in that case the court had the advantage of a videotape of the defendant's confession. That videotape contradicted his claims at his suppression hearing that the police promised he could go home if he confessed and that he was tired and scared. Here, defendant's confession was not videotaped. When asked about the absence of a video recording in this case, the interviewing officer testified that the police department's policy was to videotape statements only in homicide cases. While the trial court's review of the parties' demeanor and the actual conversation that took place in *Murdock* was undoubtedly a factor in determining whether his confession was voluntary, no mandate to record defendant's statement in this case existed, and we decline to impose one judicially. We conclude the absence of a video record here is a neutral factor that cannot support defendant's claim that his statement was involuntary.

¶ 73    Defendant also asserts that *G.O.* is distinguishable from this case for a similar reason. He maintains that here the police prevented him from speaking to a concerned adult by starting the interview only minutes after leaving messages for Director Kehoe and defendant's caseworker. We reject this argument for the same reasons we rejected defendant's similar contention about *Murdock*. *Supra* ¶ 71. Furthermore, we have already held that the police complied with their statutory duty of notification. *Supra* ¶ 48. Having fulfilled that duty, the police were under no obligation to delay the start of defendant's interview.

¶ 74    Next, defendant attempts to distinguish *G.O.* because the juvenile in that case performed well in school while this defendant's motion to suppress alleged that he was "a special education student with limited reading comprehension and comprehension skills." No evidence of defendant's allegedly deficient reading and comprehension skills was offered, however, at the motion hearing. In addition, we defer, as we must under this record, to the trial court's conclusion that defendant understood his rights and possessed sufficient maturity and intellectual ability to make a valid statement.

¶ 75    Indeed, the record shows he was astute enough to tell the police initially that the victim had instigated the single act of consensual oral sex that he admitted took place. This deliberate attempt to avoid culpability belies any claim that he was confused by the questioning, intimidated by the authority figures, or unable to understand the serious nature and consequences of the interview process.

¶ 76    Defendant next argues that, unlike in *G.O.*, the police tricked and deceived him during questioning. While deception is not *per se* unlawful, it can contribute to the coerciveness of the interrogation and weigh against a finding of voluntariness. *G.O.*, 191 Ill. 2d at 54-55. Defendant asserts that his confession was made immediately after Detective Atamian told him the police would check video surveillance footage from businesses in the vicinity of the assault for discrepancies in his story even though the officer did not know at that time

whether any footage was available. He adds that even if the officer's statements were technically true, they amounted to trickery designed to induce him to confess.

¶ 77    Defendant does not dispute that the examining officer never said incriminating footage had actually been recovered, and the police looked later, unsuccessfully, for surveillance cameras in the area. While the mere prospect that video footage revealing inaccuracies in his statement could be recovered likely influenced defendant's decision to renounce his initial story, that result is consistent with the underlying purpose of any interrogation, *i.e.*, to elicit the truth. The officer's statement accurately informed defendant of what the police would be doing to verify his account. Therefore, we decline defendant's invitation to deem the interviewing officer's utterly truthful statement to be "trickery." Overall, we conclude that the factual distinctions defendant alleges exist between this case and *G.O.* are insignificant.

¶ 78    The appellate court, however, relied on defendant's youth and inexperience, as well as its view that the police did not do enough to contact a concerned adult and that Detective Kaminski's actions conflicted with his role as a youth officer, to conclude that the trial court erred in denying defendant's motion to suppress because it was involuntary. After considering the totality of the circumstances surrounding defendant's confession, as well as our prior decisions in *G.O.*, *Morgan*, and *Murdock* that upheld the admissibility of statements under substantially similar conditions, we hold the appellate court erroneously reversed the trial court's denial of defendant's motion to suppress his statement.

¶ 79                    B. Ineffective Assistance of Counsel

¶ 80    As an alternative basis to uphold the appellate court's finding that the trial court erred in denying his suppression motion, defendant argues in his cross-appeal that his trial counsel failed to provide him with effective legal assistance. He contends that by not offering evidence of his diminished mental capacity at the suppression hearing to support the bare claim in his motion to suppress that he was "a special education student with limited reading comprehension and comprehension skills," counsel violated defendant's right to effective assistance. He asserts that counsel's knowledge of his limited intellectual functioning and longstanding mental health issues was demonstrated by counsel's request for a pretrial fitness hearing and subsequent review of the examining psychiatrist's report.

¶ 81    To establish ineffective assistance of counsel, a defendant must satisfy the two-prong *Strickland* test, demonstrating that: (1) counsel's performance was objectively unreasonable compared to prevailing professional standards; and (2) there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced. *People v. Bew*, 228 Ill. 2d 122, 128-29 (2008). Furthermore, a "reasonable probability" is defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). When reviewing a ruling on a motion to suppress, overcoming the prejudice prong requires the defendant to show a reasonable probability *both* that: (1) the suppression motion would have been granted; *and* (2) the trial outcome would have been different if the evidence had been suppressed. *Bew*, 228 Ill. 2d at 128-29. Because we may properly resolve claims of ineffective assistance after

examining only the prejudice prong (*People v. Hale*, 2013 IL 113140, ¶ 17), we begin here by examining defendant's allegations of prejudice.

¶ 82     Defendant claims that his lengthy mental health history and limited intellectual capacity made him more susceptible to subtle police intimidation and coercion and that the evidence of his mental functioning would have weighed heavily in his favor in evaluating the voluntariness of his confession. If that evidence had been offered during the suppression hearing, defendant asserts that the outcome would have been different and his motion would have been granted, establishing prejudice.

¶ 83     Even if we accept defendant's contention that the trial court would have suppressed his statement in light of the additional evidence, he has still failed to demonstrate a reasonable probability that the outcome of the entire trial would have changed, resulting in his acquittal. See *Bew*, 228 Ill. 2d at 128-29 (requiring a reasonable probability of different outcomes at both the suppression hearing and the trial). Disregarding any evidence related to defendant's statement, the trial evidence consists predominantly of the conflicting accounts offered by defendant and the victim, along with physical evidence of her injuries and the damage to her GPS and the treatment facility's van. At its core, the 25-year-old victim testified that she was assigned by her employer to pick defendant up in the van and return him to the center after a weekend visit with his family. After starting back to the facility with defendant, she described being frightened and physically overwhelmed by the much larger defendant, who forced her to exit the highway and park the van in a vacant parking lot. Although she repeatedly tried to escape, defendant was able to grab and restrain her, sometimes choking her into compliance. She was forcibly subjected to two brief nonconsensual oral sex acts, as well as to nonconsensual sexual intercourse, that lasted between 30 and 45 seconds. At the end of the assault, defendant apologized and said he had not intended to hurt her. After stating she would not tell anyone what had happened, she was allowed to drive the van back to the residential treatment facility. Once defendant was locked inside his unit, she immediately reported the assault to a co-worker, collapsing and sobbing, and the police were called.

¶ 84     Photographs taken several hours after the incident and testimony from the police officer who initially interviewed the victim and the treating emergency room physician confirmed that she was visibly upset and exhibited fresh bruises on her left thigh, wrist, elbow, and waist or hip. The police officer also recalled seeing a red mark on the side of her neck that did not photograph well several hours after the attack. In addition, a large area of dirt on the driver's side of the van was smeared and a smudged handprint was discovered near the sliding door, consistent with the victim's story that defendant caught her by her coat hood after she escaped from the van and pushed her against its side before shoving her inside again. Also consistent with E.C.'s account, her frayed GPS cord was found in the parking lot where the assault took place. Finally, the van's visor was recovered from the floor of the vehicle, ripped from its hinge, consistent with a struggle.

¶ 85     For his part, defendant's testimony differed in nearly every respect. He stated that before this incident he had recognized the victim as a facility staff member and that she had taken him to a movie he had earned as a behavioral reward a few days before the incident. On the day of the assault, he claimed it was E.C. who chose to exit the highway and park in the vacant lot. She then asked defendant to get into the backseat of the van, and she exited the

- 18 -

vehicle merely to get into the backseat with him. She unzipped defendant's pants and proceeded to perform oral sex for three or four minutes before saying it was time to return to the facility and telling him she would not say anything about the events if he did not. He denied engaging in any other sexual activity with her. He then returned to the front seat through the middle aisle of the van while the victim exited the vehicle and re-entered through the driver's side door. At some point, she mentioned to defendant that it was her birthday. After returning to the treatment facility, defendant relaxed in the dayroom until he was escorted to the lobby by his therapist and Director Kehoe, where he was handcuffed and taken into custody before being driven to the police station. Defendant expressly denied the details of the assault related in the victim's testimony.

¶ 86     On cross-examination, defendant indicated E.C. made up the allegations. He denied ever getting out of the van or struggling with her while parked in the vacant lot. He had no explanation for the multiple fresh bruises on the victim's body within hours of the assault or the damage to the van and the GPS.

¶ 87     Although credibility is generally a question for the trier of fact (*People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007)), here the physical evidence strongly corroborated E.C.'s testimony. The details of her account were entirely consistent with the physical evidence of a violent assault, while defendant's account could not be reconciled with that evidence. Given the overwhelming evidence corroborating the victim's testimony and weighing against defendant's account, we are not persuaded that it is reasonably probable that a jury would have acquitted defendant even in the absence of any reference to his confession at trial. The reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial. Therefore, defendant has failed to establish the prejudice prong of the *Strickland* test, and we reject his claim that defense counsel provided constitutionally ineffective assistance. See *Hale*, 2013 IL 113140, ¶ 17 (noting that claims of ineffective assistance of counsel may be decided on the *Strickland* prejudice prong alone). Because the appellate court erred in holding defendant's motion to suppress his statement should have been granted, we reverse that portion of its judgment and affirm the trial court's denial of defendant's motion.

¶ 88                    C. Constitutionality of the Mandatory Transfer Statute

¶ 89     In his cross-appeal, defendant argues that the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2008)), automatically transferring certain minors from the jurisdiction of the juvenile court to the adult criminal court, is constitutionally invalid. More specifically, he contends that the automatic transfer statute, either alone or in conjunction with Illinois's mandatory consecutive sentencing scheme (730 ILCS 5/5-8-4(a)(ii) (West 2008)) and "Truth in Sentencing" rules requiring him to serve at least 85% of his sentence (730 ILCS 5/3-6-3(a)(2)(ii) (West 2008)), is unconstitutional. These provisions purportedly do not take into account the inherent differences between juveniles and adults, including juveniles' reduced culpability and greater ability to change. Therefore, defendant argues that the provisions are fatally "flawed," violating the federal and state due process clauses (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2), the cruel and unusual punishment clause of the eighth amendment of the federal constitution (U.S.

Const., amend. VIII), and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 90    Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional. In addition, courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of its validity. We review the constitutionality of any statute *de novo*. *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010).

¶ 91    Here, the automatic transfer statute requires juveniles who are at least 15 years old and charged with one of the enumerated crimes to be prosecuted in adult criminal court rather than in juvenile court. The specified crimes are first degree murder, aggravated battery with a firearm, when the minor has personally discharged the firearm, armed robbery committed with a firearm, aggravated vehicular hijacking committed with a firearm, and aggravated criminal sexual assault. 705 ILCS 405/5-130 (West 2008). Because defendant was 15 years old when he was charged with aggravated criminal sexual assault, the provision required him to be automatically transferred to criminal court for trial and, if convicted, sentenced as an adult.

¶ 92                                    1. *The Due Process Claim*

¶ 93    We first address defendant's due process claim. As both parties recognize, this court rejected a similar claim challenging the predecessor to section 5-130 in *People v. J.S.*, 103 Ill. 2d 395 (1984). In that consolidated case, the three defendants were each 16 years old when the offenses were committed, and they were automatically transferred to criminal court under the statute. The trial court in each case found the transfer statute unconstitutional, and on direct appeal to this court, the defendants argued it violated both procedural and substantive due process. *J.S.*, 103 Ill. 2d at 402.

¶ 94    In rejecting that claim, this court distinguished *Kent v. United States*, 383 U.S. 541 (1966), where the United States Supreme Court invalidated a District of Columbia statute allowing minors to be tried as adults, potentially exposing some of them to the death penalty or life imprisonment, if the trial court determined that juvenile court jurisdiction should be waived after a "full investigation." *Kent*, 383 U.S. at 547. The Court held that due process was violated because the statute did not provide sufficient guidance in deciding when waiver was proper, permitting potentially arbitrary rulings, and because the statute did not provide juveniles with a hearing before that determination was made. *Kent*, 383 U.S. at 561-62. We concluded in *J.S.* that Illinois's automatic transfer statute did not suffer from the same failing because it required all 15- and 16-year-olds charged with the listed offenses to be transferred to criminal court, thus eliminating the potential for the use of unguided discretion in the juvenile court that was found to be unconstitutional by the Supreme Court. *J.S.*, 103 Ill. 2d at 405. Applying a similar rationale in *People v. P.H.*, 145 Ill. 2d 209, 236 (1991), we also rejected a juvenile defendant's due process challenge to the "gang-transfer" provisions of the transfer statute.

¶ 95    Furthermore, this court again upheld the automatic transfer statute against a due process challenge in *People v. M.A.*, 124 Ill. 2d 135, 147 (1988). In that case, the juvenile defendant's challenge was based on the legislature's 1985 statutory amendment of the transfer provision, adding unlawful use of weapons on school grounds to the list of eligible offenses. *M.A.*, 124

Ill. 2d at 138. We concluded that the legislature did not act irrationally or arbitrarily or contravene the purpose of the Juvenile Court Act of 1987 in amending the statute and upheld the constitutional validity of the amended statute. *M.A.*, 124 Ill. 2d at 145-46.

¶ 96 Here, however, defendant asserts that *J.S.* is no longer valid law in light of the United States Supreme Court's subsequent rulings in *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012). Defendant argues that this court's reliance on the absence of any statutory judicial discretion in *J.S.* to uphold the transfer statute supports his allegation of a due process violation in this case because those Supreme Court decisions emphasized a need to recognize the unique characteristics of youthful offenders that is inconsistent with an automatic transfer.

¶ 97 As previously discussed, in *J.S.*, the defendant unsuccessfully attempted to support his due process argument by distinguishing the Supreme Court's due process analysis in *Kent*. *J.S.*, 103 Ill. 2d at 404-05. In contrast, here defendant is attempting to support his due process argument by relying on the Supreme Court's eighth amendment analysis in *Roper*, *Graham*, and *Miller*. Defendant's constitutional argument is crafted from incongruous components. Although both the Supreme Court and defendant have emphasized the distinctive nature of juveniles, the applicable constitutional standards differ considerably between due process and eighth amendment analyses. A ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision. See *People v. Davis*, 2014 IL 115595, ¶ 45 (finding the juvenile defendant's sentence violated the eighth amendment but declining to consider his state due process and proportionate penalties challenges). In other words, a constitutional challenge raised under one theory cannot be supported by decisional law based purely on another provision. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Accordingly, we reject defendant's reliance on the Supreme Court's eighth amendment case law to support his procedural and substantive due process claims.

¶ 98 Moreover, this court has recently had the opportunity to examine the effect of the Supreme Court's analyses in *Roper*, *Graham*, and *Miller* in a due process challenge raised by the defendant in *Davis*, 2014 IL 115595, ¶ 30. As in this case, the defendant in *Davis* relied heavily on the "special status" of juveniles acknowledged by the Supreme Court. As we noted, however, this court recognized the special characteristics and vulnerabilities of juvenile offenders several years earlier, substantially anticipating the Supreme Court's view in our extensive discussion in *People v. Miller*, 202 Ill. 2d 328 (2002) (hereinafter, *Leon Miller*). *Davis*, 2014 IL 115595, ¶ 45. We concluded in *Davis* that *res judicata* precluded our reconsideration of whether due process was violated by the imposition of a natural life sentence on the 14-year-old defendant even in the aftermath of *Roper*, *Graham*, and *Miller*, and we find no more persuasive basis here to reconsider our decision to uphold the transfer statute in the face of a due process challenge in *J.S.*

¶ 99                          2. *The Eighth Amendment and Proportionate Penalties Claims*

¶ 100 Defendant more properly relies on the decisions in *Roper*, *Graham*, and *Miller* to support his constitutional challenge to the Illinois automatic transfer statute under the federal cruel and unusual punishment clause (U.S. Const., amend. VIII) and our state proportionate

penalties clause (Ill. Const. 1970, art. I, § 11). He contends that those decisions require a finding that the transfer statute, either alone or in conjunction with Illinois's mandatory consecutive sentencing scheme (730 ILCS 5/5-8-4(a)(ii) (West 2008)) and "Truth in Sentencing" rules (730 ILCS 5/3-6-3(a)(2)(ii) (West 2008) (requiring defendant to serve 85% of his sentence)), are fatally flawed because they do not take juveniles' distinctive characteristics into account. Defendant asserts that the challenged statutes fail to recognize modern scientific research showing that youths are different from adults in three ways. Research shows that juveniles differ from adults because they are: (1) more impulsive; (2) more vulnerable to negative influences and outside pressure; and (3) possess a less well formed character, making their actions less indicative of irreversible depravity. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. In recognition of those findings, the Supreme Court has concluded that juveniles "are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. Defendant argues that, therefore, the Supreme Court has extended two death penalty case rules to juveniles in non-capital cases: (1) categorically disallowing application of the same harsh sentencing standards as adults because they are inconsistent with evolving standards of decency; and (2) requiring individualized sentences for juveniles because "death is different" and so are minors. *Miller*, 567 U.S. at ___, ___, ___, ___, ___, 132 S. Ct. at 2460, 2463-64, 2467, 2470, 2475.

¶ 101   We begin our review by examining the relevant constitutional language. The eighth amendment protects defendants against cruel and unusual punishment, while the Illinois proportionate penalties clause similarly bars the imposition of unreasonable sentences, stating that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, § 11). Under the definition of the plain language used, neither clause applies unless a punishment or penalty has been imposed.

¶ 102   To support his claim that the transfer statute is covered by the eighth amendment and the proportionate penalties clause because it is punitive rather than procedural, defendant analogizes to *ex post facto* cases where transfer statutes have been deemed to be inherently punitive because they ultimately resulted in the imposition of harsher sentences on juveniles. *United States v. Juvenile Male*, 819 F.2d 468, 471 (4th Cir. 1987). We are not persuaded by defendant's line of reasoning.

¶ 103   Just as due process cases cannot be resolved based solely on eighth amendment analyses, neither can eighth amendment issues be disposed of based solely on the rationale and standards applied in *ex post facto* cases. See *Lanier*, 520 U.S. at 272 n.7 (explaining that a constitutional attack based on one provision cannot be supported by decisions relying strictly on another provision). Defendant's challenge is raised pursuant to the eighth amendment and Illinois's proportionate penalties clause. It does not implicate *ex post facto* law, and, in any event, this court is not bound by decisions cited by defendant (*People v. Clemons*, 2012 IL 107821, ¶ 32).

¶ 104   We also reject defendant's assertion that the transfer statute effectively functions as a sentencing statute, particularly when applied with mandatory consecutive sentencing and "truth in sentencing" provisions. As this court has repeatedly explained, access to juvenile courts is not a constitutional right because the Illinois juvenile justice system is a creature of legislation. *M.A.*, 124 Ill. 2d at 141; *J.S.*, 103 Ill. 2d at 402. Whether a defendant is tried in

juvenile or criminal court is purely a matter of procedure. *City of Urbana v. Andrew N.B.*, 211 Ill. 2d 456, 486 (2004) (Freeman, J., dissenting); *P.H.*, 145 Ill. 2d at 222. Even if we accept the assertion that a juvenile who is convicted in criminal court is always subject to a lengthier sentencing range and harsher prison conditions than if he had been adjudicated in juvenile court, defendant cites nothing that can convert a purely procedural statute into a punitive one.

¶ 105　　This court has previously concluded that the purpose of the transfer statute is to protect the public from the most common violent crimes, not to punish a defendant. In enacting the automatic transfer statute, the legislature has reasonably deemed criminal court to be the proper trial setting for a limited group of older juveniles charged with at least one of five serious named felonies. *J.S.*, 103 Ill. 2d at 403-04. Because we decline to second-guess the validity of the legislature's judgment (*P.H.*, 145 Ill. 2d at 233), defendant has not convinced us to disregard our long held view that the transfer statute is purely procedural and now construe it to be punitive. As we stated in *M.A.*, 124 Ill. 2d at 146, "The differences in treatment created by the statute in question is not in the penalty provided for different offenses." The mere possibility that a defendant may receive a potentially harsher sentence if he is convicted in criminal court logically cannot change the underlying nature of a statute delineating the legislature's determination that criminal court is the most appropriate trial setting in his case. We reject the connection between the transfer statute and the imposition of harsher punishment alleged by defendant as simply too attenuated to be persuasive.

¶ 106　　Therefore, in the absence of actual punishment imposed by the transfer statute, defendant's eighth amendment challenge cannot stand. See *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). Because the Illinois proportionate penalties clause is co-extensive with the eighth amendment's cruel and unusual punishment clause (*In re Rodney H.*, 223 Ill. 2d 510, 518 (2006)), we also reject defendant's challenge under our state constitution.

¶ 107　　Finally, defendant suggests that, at a minimum, the combination of the transfer statute and the applicable sentencing provisions is unconstitutional as applied to non-homicide offenders because they are "categorically less deserving of the most serious forms of punishment than are murderers." *Graham*, 560 U.S. at 69. Because defendant did not kill or intend to kill, he claims he has a "twice diminished moral culpability" and does not deserve the most severe punishments. *Graham*, 560 U.S. at 69. Defendant asserts that youthfulness must be considered whenever "a harsh adult sentence" is given to a minor because juveniles' distinctive traits are not crime-specific, citing *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465. In support, defendant also cites *Leon Miller*, 202 Ill. 2d at 340-41, where this court found the imposition of a mandatory life sentence on a 15-year-old convicted of two counts of first degree murder based on accountability after an automatic transfer to adult court unconstitutional because the youth's age and personal culpability were never considered.

¶ 108　　Here, defendant was sentenced to 12 years in prison on each of three counts of aggravated criminal sexual assault. The sentences were required to be served consecutively (730 ILCS 5/5-8-4(a)(ii) (West 2008)), and defendant was statutorily mandated to serve at least 85% of his total prison term (730 ILCS 5/3-6-3(a)(2)(ii) (West 2008)), or 30 years, 7 months. Although lengthy, that term is not comparable to either the death penalty or " 'the second most severe penalty permitted by law,' " life in prison without parole (*Graham*, 560 U.S. at 69 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.))).

The Supreme Court has clearly distinguished the latter sentences from any others, noting both the uniqueness of the " 'severity and irrevocability' " of the death penalty and the "characteristics with death sentences that are shared by no other sentences" besides life without parole. *Graham*, 560 U.S. at 69 (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). The Supreme Court has also instructed that "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," but only to give those offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," expressly leaving the specific mechanism and means to each state. *Graham*, 560 U.S. at 75. Most recently, in *Miller* the Court reiterated the *Graham* rationale and emphasized the "unprecedented" nature of the Court's expansion of its categorical ban to the imposition of life without parole for juveniles in nonhomicide cases. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466.

¶ 109 Similarly, this court has unanimously declined to expand the narrow rule in *Graham* to all juveniles sentenced to life without parole for homicides. *Davis*, 2014 IL 115595, ¶¶ 48-49. Although defendant relies on *Leon Miller*, that decision is inapposite. There, we described the minor defendant as "the least culpable offender imaginable," having been convicted of two murders *solely* on the theory of accountability. Nonetheless, he was subject to mandatory life in prison with no possibility of parole. *Leon Miller*, 202 Ill. 2d at 341. In our ruling, we focused on the particular harshness and obvious lack of proportionality of that sentence in light of the unique facts of the case. We expressly:

> "agree[d] with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole—the same sentence applicable to the actual shooter." *Leon Miller*, 202 Ill. 2d at 341.

Nonetheless, we refrained from barring the imposition of a life sentence on any juvenile offender, denying any implication "that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate." As we explained, "[i]t is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Leon Miller*, 202 Ill. 2d at 341.

¶ 110 Accordingly, both this court and the United States Supreme Court have closely limited the application of the rationale expressed in *Roper*, *Graham*, and *Miller*, invoking it only in the context of the most severe of all criminal penalties. A prison term totalling 36 years for a juvenile who personally committed three counts of aggravated criminal sexual assault does not fall into that category. We decline defendant's invitation to extend the Supreme Court's eighth amendment rationale to the facts of this case.

¶ 111 We do, however, share the concern expressed in both the Supreme Court's recent case law and the dissent in this case over the absence of any judicial discretion in Illinois's automatic transfer provision. While modern research has recognized the effect that the

- 24 -

unique qualities and characteristics of youth may have on juveniles' judgment and actions (see, *e.g.*, *Roper*, 543 U.S. at 569-70; *infra* ¶ 156), the automatic transfer provision does not. Indeed, the mandatory nature of that statute denies this reality. Accordingly, we strongly urge the General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases.

¶ 112                                D. The Illinois Rape Shield Law

¶ 113    After reversing defendant's convictions and remanding the cause for a new trial, the appellate court considered whether the trial court properly denied defendant's request to introduce evidence of the victim's sexual history under an exception to the Illinois rape shield statute (725 ILCS 5/115-7 (West 2008)). Following the rationale in *People v. Anthony Roy W.*, 324 Ill. App. 3d 181 (2001), the court held that the exclusion of evidence that the victim had engaged in sexual intercourse with someone other than defendant in the days prior to the assault was an abuse of the trial court's discretion. Consequently, the court directed the trial court to admit the evidence on retrial. 2012 IL App (1st) 101573, ¶ 49 (modified upon denial of rehearing Sept. 26, 2012).

¶ 114    In examining evidentiary rulings, we apply a deferential standard of review, considering only whether they were an abuse of the trial court's discretion. To establish an abuse of discretion, defendant must persuade us that the trial court's decision to exclude the evidence was "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004). We have previously noted the "absolute" nature of the rape shield bar, subject only to two narrow statutory exceptions for "evidence concerning the past sexual conduct of the alleged victim [or corroborating witness] *** with the accused" and evidence that is "constitutionally required to be admitted." (Internal quotation marks omitted.) *Santos*, 211 Ill. 2d at 401. See also 725 ILCS 5/115-7(a) (West 2008).

¶ 115    Here, the State's argument against admission of the evidence relies on the similarities between this case and *Santos*, while defendant claims that this case more closely resembles *Anthony*. We find neither case to be dispositive here because both are factually distinguishable.

¶ 116    The true core of defendant's argument is based on *dicta* in *People v. Sandoval*, 135 Ill. 2d 159, 185 (1990), stating that one "extraordinary circumstance[ ]" potentially satisfying the constitutional requirement exception to the rape shield statute is an offer of evidence providing an alternative explanation for the victim's observed injuries. Here, the injury at issue was noted by the victim's examining physician, who testified that she had "some" cervical redness that was "consistent with sexual intercourse." In a sidebar, defense counsel requested permission "to go into whether or not sperm was found in [the victim's] vagina, which would otherwise be protected by the rape shield, but [defendant] has a constitutional right, I think, to bring out that evidence when there's an inference that she had recent sexual intercourse and he's denying that he had sexual intercourse with her, and she had sexual intercourse, apparently, with someone else within 72 hours, knowing how far—that's about how long sperm lasts."

¶ 117    In ruling on the request, the trial judge noted that the physician testified to the presence of some redness but "did not say it was the result of a rape. He did not even trace it back to this incident." The trial court added that "[i]t would be different *** if we were in a situation if he said he found some injury that was consistent with forced sexual act within the last few hours. Then we'd be in a different ballpark, so I think based on how he's described it and how he described the significance or insignificance of that finding to this jury. Respectfully your request is denied." The appellate court, however, reversed that ruling and permitted defendant, "on retrial, if the State introduces any evidence of [the victim's] physical condition to show that she had intercourse within a day or two of the medical examination." 2012 IL App (1st) 101573, ¶ 49 (modified upon denial of rehearing Sept. 26, 2012).

¶ 118    Before this court, the State argues that defendant failed to provide adequate support for his request to admit the evidence under the rape shield exception to create an appealable issue (*People v. Maxwell*, 2011 IL App (4th) 100434, ¶¶ 76-87; *People v. Grant*, 232 Ill. App. 3d 93, 103-05 (1992)). We agree in light of the important purpose underlying the rape shield statute, namely "to prevent the defendant from harassing and humiliating the prosecutrix at trial with evidence of *** specific acts of sexual conduct with persons other than the defendant" (*Sandoval*, 135 Ill. 2d at 180). To preserve a claim on appeal, a party is required to make "considerably detailed and specific" offers of proof after a denial of a request to admit evidence if the substance of the witness's answer is unclear. See *People v. Peeples*, 155 Ill. 2d 422, 457 (1993).

¶ 119    Here, the only support offered for defense counsel's proffered evidence was his speculation that the victim's cervical inflammation occurred three days before the assault because sperm could persist for 72 hours. No medical testimony was offered to back up counsel's bare assertion, and counsel did not take the opportunity to ask the examining physician, or any other expert, questions about the general persistence of cervical inflammation that could have provided a sufficiently detailed offer of proof.

¶ 120    Although defendant asserts the futility of asking additional questions because the examining physician had already testified that he could not tell when the injury occurred, our review of the record contradicts defendant's position. On cross-examination, the examining physician was asked, "You don't know exactly when [the cervical inflammation] occurred; is that correct, sir?" The physician responded, "I don't know when that occurred." Contrary to defendant's contention, the physician's response did not establish that he had a medical opinion on whether the redness could have persisted for three days. The question asked only if the witness could tell "exactly when" the inflammation occurred.

¶ 121    This distinction was not lost on defense counsel, who later used the inconclusive nature of the physician's testimony to establish his theory of the case during closing arguments. Defense counsel asserted that the cervical redness:

> "could be caused by anything. It could be a rash. I don't know. The doctor says there's a redness in the cervix, and it could be caused by consensual or nonconsensual sex. Consensual or nonconsensual sex, when? The doctor didn't say. Within the last three hours, within the last ten hours, the last three days, the last four days? How does that prove he had sex with her? It doesn't. It's meaningless."

¶ 122    During his closing argument, counsel also noted the absence of any DNA from defendant, arguing "the greatest meaning of anything in this case is no DNA. Don't let them

- 26 -

kid you about that. They can find DNA from saliva on a chicken bone that's six months old after you chew on it. There's no DNA in this case. And according to them, he's all over her. He's all over her. She can't move." After reviewing the testimony elicited from the witnesses and defense counsel's closing argument, we conclude that, as in *Sandoval*, the trial court's exclusion of the evidence of the victim's sexual history did not prevent defendant from presenting the jury with his theory of the case. *Sandoval*, 135 Ill. 2d at 181.

¶ 123　　Before this court, defendant also argues that the medical sources cited in the State's brief indicate cervical inflammation could, in fact, last three days. It was, however, defense counsel's burden to provide a sufficiently detailed offer of proof *at trial*, not months or years later on appeal. See *People v. Canulli*, 341 Ill. App. 3d 361, 367-68 (2003) (stating that appellate review is limited to the record on appeal). When reviewing an evidentiary ruling for an abuse of discretion, common sense dictates that we evaluate the exercise of that discretion in light of the evidence actually before the trial judge. Without a sufficient offer of proof, the trial court could not have known if any witness would have testified that the victim's cervical redness could have persisted for three days or the possible underlying basis for that opinion. Because defendant did not provide a sufficient offer of proof, defendant's claim that the trial court erred in denying his evidentiary request is not subject to review. See *Peeples*, 155 Ill. 2d at 457-58 (explaining courts' inability to review appeal when an offer of proof is not "considerably detailed and specific," leaving the substance and basis of the witness's testimony unclear). Therefore, we reject the portion of the appellate court opinion instructing the trial court to admit on remand the evidence requested by defendant.

¶ 124　　　　　　　　　　　　　E. The Excessive Sentence Claim

¶ 125　　Lastly, because this court declined to grant defendant relief from his convictions or sentence on another basis, he asks that this cause be remanded to the appellate court for initial consideration of his excessive-sentence claim. The appellate court did not reach that issue in its prior judgment, and we agree with defendant that it should decide that question on remand from this court.

¶ 126　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 127　　For the reasons stated, we conclude that the police made a reasonable attempt to contact a concerned adult on behalf of the juvenile defendant, as required by section 5-405(2) of the Juvenile Court Act of 1987 (705 ILCS 405/5-405(2) (West 2008)), the youth officer's conduct was not improper, and the trial court did not err by admitting defendant's inculpatory statement. We also conclude that defendant failed to establish the prejudice necessary to show that defense counsel provided ineffective assistance during the hearing on the motion to suppress defendant's statement. We reject defendant's constitutional challenges to Illinois's mandatory juvenile transfer provision (705 ILCS 405/5-130 (West 2008)). Finally, we determine that, contrary to *dicta* in the appellate court judgment, the trial court properly applied the Illinois rape shield statute (725 ILCS 5/115-7(a) (West 2008)) to deny defendant's request to introduce evidence of the victim's sexual history. Accordingly, we reverse the appellate court judgment. We remand the cause to the appellate court for

consideration of defendant's claim that his sentence is excessive.

¶ 128    Appellate court judgment reversed.

¶ 129    Cause remanded.

¶ 130    JUSTICE THEIS, dissenting:

¶ 131    I join my colleagues in parts II.A., II.B., II.C.1, II.D., and II.E. of the majority opinion. I do not join them in part II.C.2. I believe that the excluded jurisdiction provision, or automatic transfer statute, of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2008)) violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and article I, section 11 of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 132    The eighth amendment, applicable to the states through the fourteenth amendment (see *Furman v. Georgia*, 408 U.S. 238, 239 (1972) (*per curiam*)), forbids "cruel and unusual punishment." Article I, section 11 requires, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The first part of our constitutional clause is related to its federal counterpart (see *People v. McDonald*, 168 Ill. 2d 420, 455-56 (1995); *People v. Clemons*, 2012 IL 107821, ¶ 40), and both concern punishment or penalties. According to the majority, the plain language of those clauses essentially decides this case. The majority asserts that because "neither clause applies unless a punishment or penalty has been imposed" (*supra* ¶ 101), and "the purpose of the transfer statute is to protect the public from the most common violent crimes, not to punish" (*supra* ¶ 105), the defendant's eighth amendment challenge fails. The majority's approach is ostensibly based upon a brief statement in *People v. J.S.*, 103 Ill. 2d 395, 404 (1984), where the court sketched, and accepted as reasonable, the State's offer of a possible rationale for the statute. The majority's approach also tracks that of the appellate court in a string of recent cases. See, *e.g.*, *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 24 ("The automatic transfer provision does not dictate any form of punishment as that term is used throughout criminal statutes."); *People v. Salas*, 2011 IL App (1st) 091880, ¶ 68.

¶ 133    In my view, that approach is overly simplistic, and elevates form over substance. The automatic transfer statute may indeed protect the public, but it does so by mandatorily placing juveniles in criminal court based only on their offenses, and thereby exposing them to vastly higher adult sentences and, in effect, punishing them. "[T]he true impact and frequently articulated goal of transfer proceedings" is "to subject the juvenile offender to the harsher sentencing scheme only available in the adult justice system." Jenny E. Carroll, *Rethinking the Constitutional Criminal Procedure of Juvenile Transfer Hearings: Apprendi, Adult Punishment, and Adult Process*, 61 Hastings L.J. 175, 180-81 (2009); see *People v. P.H.*, 145 Ill. 2d 209, 231 (1991) (asserting that the purpose of the "gang transfer" provision of the Juvenile Court Act of 1987 is decreasing the level of gang violence "by increasing the likelihood of criminal prosecution and sentencing").

¶ 134    " 'Adult time for adult crimes' became the rallying cry for politicians across the country, leading to changes in the law in almost every jurisdiction between 1992 and 1999. These laws extended adult court jurisdiction over youths by lowering the age requirement for adult court prosecution, expanding the range of offenses which could subject a juvenile to adult

prosecution, and shifting the decision over who remains in juvenile court and who goes to the criminal court from judges to prosecutors or legislators." Steven A. Drizin & Greg Luloff, *Are Juvenile Courts a Breeding Ground for Wrongful Convictions?*, 34 N. Ky. L. Rev. 257, 265 (2007).

¶ 135     At the leading edge of that wave of such laws, our original automatic transfer statute, and the precursor to section 5-130, was enacted in 1982. See Ill. Rev. Stat. 1982, ch. 37, ¶ 702-7(6)(a) (recodified as Ill. Rev. Stat. 1991, ch. 37, ¶ 805-4(6)(a)). There were spirited debates in both houses of the General Assembly. These debates are highly relevant in divining the purpose behind the statute. See *People v. Adams*, 144 Ill. 2d 381, 387 (1991). They leave little doubt that legislators—both supporters of the bill and supporters of the amendments—considered the statute to be punitive.

¶ 136     In the Senate, Senator Dawn Clark Netsch offered an amendment to the bill that ultimately became the automatic transfer statute. Senator Netsch's amendment did not disagree with "the basic premise that there are a number of juveniles who are violent offenders, and who ought not to be subjected, if you will, to the juvenile court system but ought to be a part of the regular criminal court system." 82d Ill. Gen. Assem., Senate Proceedings, May 26, 1982, at 34. Instead, the amendment would have substituted automatic transfers for certain violent felonies with automatic hearings before juvenile court judges, who would exercise discretion in deciding where a juvenile would be tried. *Id.* She stated, "[P]hilosophically, it seems to me that there ought to be some review by the presiding juvenile judge and that is what this amendment is intended to offer as an option." *Id.* at 35.

¶ 137     Senator Bowers, speaking against an amendment, suggested, "if you want to call them juveniles, and if you want to pretend they're juveniles, that's fine, but under today's society and today's societal acts that these people are committing, I don't think they ought to be treated that way." *Id.* at 38. Senator Collins, speaking for an amendment, stated, "I, for one, do not want to coddle criminals … hardened criminals, and I do realize the necessity for us to try and do something about *** those youths who get away under disguise of being youth, and who commit[ ] serious and hideous crime." *Id.* at 40. Also in support of an amendment, Senator DeAngelis talked about perceptions: "In this particular instance, with the way the bill is right now, it's perceived that this is going to offer greater punishment to the juvenile[s] because they have committed a more severe crime." *Id.* at 43. And Senator Netsch, in closing, insisted that the amendment was not "soft-on-crime." *Id.* at 44.

¶ 138     The debate in the House of Representatives was longer and, at times, more emotional. Representative Getty offered an amendment similar to Senator Netsch's amendment, which would have created a rebuttable presumption in favor of transfer, but would also have given juvenile court judges some discretion over transfer decisions. 82d Ill. Gen. Assem., House Proceedings, June 23, 1982, at 138.

¶ 139     Representative Daniels, speaking against an amendment to the bill, offered an example:

          " 'If a fifteen-year-old is convicted of murder under the Juvenile Act, the max sentence he can get is a period of six years, and with good time off, he'll serve three years' time for a murder—three years' time. *** I recall a conversation that I had with [then-Cook County State's Attorney] Rich[ard] Daley last year, *** and he said to me, *** "crime sure is a real problem in this country today, but the crime that I fear

the most is the crime that's being committed today by the juveniles ***".' " *Id.* at 142-43.

¶ 140 Representative Johnson had similar thoughts:

" '[J]uvenile justice, juvenile crime, is an absolute joke in Illinois and around the country. *** The purpose of this Bill *** is to say to the people of Illinois, and we hope the same example is followed nation-wide, that the victims of a juvenile rapist, armed robber or murderer are just as victimized as if the fortuitous situation [occurred] where the perpetrator of the crime was eighteen years of age. It's an absolute necessity that we have a mandatory transfer. *** [O]nce charged, a rapist, an armed robber, a murderer and so forth, ought to be charged as an adult and tried as an adult, and handled, except for incarceration purposes, through the adult criminal justice system ***.' " *Id.* at 144-45.

¶ 141 Representative Kosinski, speaking against an amendment, had " 'little sympathy for some juveniles today, who through sophistication of the media *** and the education of their peers—are hiding behind the realities of our law. I think it's abominable that we permit this to occur, and on that basis, I feel we should have an extremely strong Bill' " with automatic transfers, and not automatic hearings. *Id.* at 145. Representative Stearney, also speaking against an amendment, was more stark in his comments:

" 'A young person, a 15 or 16 year old *** values no life whatsoever; he'll take my life simply to get a few dollars. That is the person that we must take off the streets. If we're going to have a semblance of organized society in the large metropolitan areas of this state, we've got to remove the juvenile offender, that person that is committing serious crimes ***.' " *Id.* at 148-49.

¶ 142 Representative Bullock echoed that theme, which he called a "law and order issue," stating:

" 'I'm going to vote to take kids like that off the street before they hurt my kid and someone's else's kid. And I think that if a kid, 15 year old, takes a shotgun and goes out and robs someone, that he ought to be treated the same way we treat an adult; and that's to put him in jail, throw the key away, and we won't have to worry about that menace any more.' " *Id.* at 150-51.

¶ 143 Representative Ewell also touched upon that, but in the context of prison space:

" 'In fact, if you have to triple the space, you'll triple the space in order to eliminate this heinous crime. *** Murder, rape, armed robbery, and deviate sexual assault are indeed acts that ought to be transferred automatically, so the message would go, not to the people who are dead and not to the victims, but to the people who commit these heinous offenses.' " *Id.* at 153-54.

¶ 144 And Representative Bowman, speaking for a fiscal note on the bill, noted that the proponents of the bill asserted that it would send many more juveniles into the criminal justice system: " 'They are the ones who are suggesting this is going to keep more criminals off the street.' " *Id.* at 162.

¶ 145 In the final debate on the bill, Representative Frederick mentioned that Representative Getty's amendment would have " 'allowed a modicum of individualization, rather than carte blanche transfer of all juveniles involved in very serious crime.' " But she insisted that all House members still " 'want to see juveniles who commit serious adult crimes such as

murder and rape \*\*\* brought to justice.' " 82d Ill. Gen. Assem., House Proceedings, June 24, 1982, at 70.

¶ 146    Representative Bullock spoke in favor of the bill:

" '[W]hat we're talking about in this legislation is providing once and for all a clear statement of intent and a clear statement of principle to the victims of crime, not only in Cook County, but in the State of Illinois. \*\*\* And what we say in effect is that those individuals who are street-wise juveniles should be given the same type of consideration before a bar of justice, of an adult who is street-wise and happens not to be a juvenile. \*\*\* We are not going to allow \*\*\* street-wise juveniles to enter into these acts and not be punished accordingly.' " *Id.* at 71-72.

¶ 147    Representative Reilly agreed, focusing on the main point of the bill—automatic transfer: " 'A kid, fifteen, sixteen years old who's committed a murder, who's committed a rape, who's committed a very serious crime, is not a kid in the sense that we ought to be concerned about that.' " *Id.* at 73.

¶ 148    Representative Currie summarized the intent of the bill's sponsors, who were " 'selling this as a measure that will get tough on juvenile crime.' " *Id.* at 74. And Representative Henry explained his vote like this:

" 'I'm amazed at those who are against this Bill. I would like to know how many youngsters in their districts are committing murder, raping \*\*\* senior citizens, robbing the poor, and \*\*\* dealing dope in their communities. I would just like to know, because I'm sick and tired of bleeding hearts telling me, and telling some of my friends what we can and we cannot support. I would like to take some of those juveniles, those tough juveniles, and transport them all to their districts and let them deal with them.' " *Id.* at 79.

¶ 149    Even after its initial enactment, the punitive focus of the automatic transfer statute remained unchanged. In the debates surrounding the bill that later became Public Act 91-15, which added aggravated battery with a firearm on or around school property to the list of enumerated offenses excluded from juvenile court jurisdiction, the House sponsor, Representative Schmitz, agreed with Representative Turner that its purpose was to obtain "very meaningful" and "strict" prosecution—essentially, to "get tough on crime" and juveniles who use or bring guns to school. 91st Ill. Gen. Assem., House Proceedings, May 4, 1999, at 13-14. Representative Turner even queried why anyone " 'would not be totally supportive of transferring these kinds of cases to the adult court where they can be reckoned with on a harsh basis because they should be dealt with on a harsh basis.' " *Id*. at 14. Further, a bill like the one that became Public Act 98-61, which left all automatic transfers in place, " 'is not, in fact, soft on crime.' " 98th Ill. Gen. Assem., House Proceedings, April 16, 2013, at 48 (statements of Representative Currie).

¶ 150    These euphemisms indisputably mean punishment, and, in the minds of the legislators on either side of the proverbial aisle, so do automatic transfers. Other courts have recognized this for years. Defendant relies upon *United States v. Juvenile Male*, 819 F.2d 468 (4th Cir. 1987). There, a 15-year-old juvenile was charged with three murders on a Marine base. At the time of the offenses, the federal Juvenile Delinquency Act did not allow the government to prosecute minors as adults. Congress then amended the statute to provide for transfers. The

federal district court determined that the amended statute could be applied retroactively because it was a procedural change in the law.

¶ 151    The federal circuit court disagreed, holding that the amended statute could not be applied retroactively because it plainly imposed greater, more burdensome, and more onerous punishment by exposing the juvenile to a much more severe sentence. *Id.* at 470. The court explained:

> "The 1984 amendment is 'procedural' only in the most superficial, formal sense, in that it authorizes the government to move to 'transfer' the juvenile to the district court for trial as an adult. Such a 'transfer' is no mere change in venue ***; it is instead a means by which to impose on certain juveniles the harsher sentences applicable to adults. The significance of the 'transfer' is not that the transferred defendant must appear in a different court, the district court, and defend himself according to the procedural rules of the district court instead of those of a juvenile court. Rather, its significance is that the transferred defendant is suddenly subject to much more severe punishment. Only by closing one's eyes to the actual effect of the transfer can one label this radical increase in the applicable punishment a procedural change." *Id.* at 471.

¶ 152    Accord *Helton v. Fauver*, 930 F.2d 1040, 1045 (3d Cir. 1991) (holding that "it is indisputable that [the defendant's] punishment was increased as a result of the waiver of juvenile court jurisdiction"); *Saucedo v. Superior Court*, 946 P.2d 908, 911 (Ariz. Ct. App. 1997).

¶ 153    The majority rejects defendant's line of reasoning, but not on its merits. The majority has chosen to remain blind to the true effect of automatic transfers on the grounds that that effect was observed in *ex post facto* clause cases. But the holdings in those cases are not so easily cabined, and their reasoning is persuasive. The key is not whether the defendant here has raised an *ex post facto* clause challenge to the automatic transfer statute, but whether that provision is punitive. In my view, it is.

¶ 154    That conclusion, however, does not end the inquiry. What makes the automatic transfer statute unconstitutional is not that it is punishment, but that it runs afoul of "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality op.). Here is where *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), enter our conversation. Those cases have incrementally led to a general rule that "youth matters," so statutes with mandatory sentencing consequences for juveniles that fail to account for their diminished culpability and individual characteristics are constitutionally infirm. See *id.* at ___, 132 S. Ct. at 2471. That rule, I believe, dictates the proper outcome of this case.

¶ 155    In *Roper*, the Supreme Court considered whether the eighth amendment prohibited capital sentences for juveniles who commit murder. The Court stated that the cruel and unusual punishment clause, like other expansive language of the constitution, "must be interpreted according to its text, by considering history, tradition, and precedent." *Roper*, 543 U.S. at 560. To do so, the Court reiterated that it must refer to " 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id.* at 561 (quoting *Trop*, 356 U.S. at 100-01).

According to the Court, the beginning point of the analysis is "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures" regarding the challenged punishment, followed by an exercise of independent judgment as to whether that punishment is indeed disproportionate. *Id.* at 564.

¶ 156     The Supreme Court determined that there was a national consensus against capital sentences for juveniles, shown by the fact that 30 states prohibited the juvenile death penalty, and the other 20 states practiced it infrequently. *Id.* at 564-67. The Court then turned to the other part of its analysis: its own judgment about the proportionality of capital sentences for juveniles. Capital sentences should be reserved for those offenders whose extreme culpability warrants such a sanction (*id.* at 568), but "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders" (*id.* at 569).

> "First, as any parent knows and as the scientific and sociological studies *** tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' *Johnson* [*v. Texas*, 509 U.S. 350, 367 (1993)]; see also *Eddings* [*v. Oklahoma*, 455 U.S. 104, 115-16 (1982)] ('Even the normal 16-year-old customarily lacks the maturity of an adult'). It has been noted that 'adolescents are overrepresented statistically in virtually every category of reckless behavior.' Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339 (1992). ***

> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings*, [455 U.S.] at 115 ('[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage'). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) *** ('[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting').

> The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968)." *Roper*, 543 U.S. at 569-70.

¶ 157     According to the Court, these differences militate against any conclusion that juveniles fall among the worst offenders, and their "diminished culpability" means the penological justifications for the death penalty—retribution and deterrence—apply to them with less force. *Id.* at 570-71. As for retribution, the Court noted that if most adult murderers are not culpable enough to receive capital sentences, juvenile murderers certainly are not: "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 571. As for deterrence, the Court noted that it remains unclear whether the

death penalty factors into the calculus of juvenile murders: "[T]he absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Id.*

¶ 158    In *Graham*, the Court considered whether the eighth amendment prohibited life-without-parole sentences for juveniles who commit nonhomicide offenses. The Court stated that its eighth amendment jurisprudence could be broken into two groups: cases involving specific challenges to term-of-years sentences, and cases involving general challenges to the propriety of certain sentences for certain offenders. *Graham*, 560 U.S. at 59. The second group has typically concerned the death penalty. *Id.* at 60. In that context, the Court has outlawed capital sentences for defendants guilty of nonhomicide offenses, as well as for defendants who fall into certain categories, including juveniles. *Id.* at 61 (citing *Roper*, 543 U.S. 551). The analysis used in the cases adopting categorical bans on capital sentences has two steps: The Court initially considers objective indicia of society's standards, as expressed in legislation across the country regarding such sentences, then it exercises its own independent judgment about the constitutionality of such sentences. *Id.*

¶ 159    The Court found only a mild consensus against life-without-parole sentences for juveniles guilty of nonhomicide offenses, but noted that it faced a similar situation more than 20 years earlier in *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (plurality op.), where it concluded that capital sentences for juveniles under age 16 violated the cruel and unusual punishment clause. *Graham*, 560 U.S. at 66. There, and relevant to the case before us, a plurality of the Court stated that the fact that many states considered juveniles between ages 15 and 18 old enough to be tried in criminal court did not mean those states had made a judgment about what sentences those juveniles should receive. *Id.* (quoting *Thompson*, 487 U.S. at 826 n.24). The Court stated:

> "Many States have chosen to move away from juvenile court systems and to allow juveniles to be transferred to, or charged directly in, adult court under certain circumstances. Once in adult court, a juvenile offender may receive the same sentence as would be given to an adult offender, including a life without parole sentence. But the fact that transfer and direct charging laws make life without parole possible for some juvenile nonhomicide offenders does not justify a judgment that many States intended to subject such offenders to life without parole sentences.
>
> *** [T]he statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration." *Graham*, 560 U.S. at 66-67.

¶ 160    The Court then turned to its own task of interpreting the eighth amendment. That task requires consideration of the culpability of the offenders in light of their crimes and characteristics, the severity of the sentence, and the sentence's relation to "legitimate penological goals," including retribution, deterrence, incapacitation, and rehabilitation. *Id.* at 67, 71. The Court returned to *Roper*, and reiterated that juveniles have less culpability than adults: they generally display a lack of maturity and an underdeveloped sense of responsibility, making them more vulnerable to negative influences and outside pressures. *Id.* at 68 (discussing *Roper*). Juveniles should not be absolved of their transgressions, but they

are not as morally reprehensible, and, consequently, not as deserving of the most severe punishments. *Id.* (quoting *Thompson*, 487 U.S. at 835). The Court emphasized:

> "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. [Citations.] Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults. *Roper*, 543 U.S., at 570. It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.' *Ibid.*" *Id.*

The Court also observed that a life-without-parole sentence is the second most severe penalty permitted by law. *Id.* at 69.

¶ 161    Turning to penological goals, the Court stated that retribution could not support life-without-parole sentences for juveniles: The case for retribution is just not as strong with a minor as with an adult. *Id.* at 71 (quoting *Roper*, 543 U.S. at 571). The Court further stated that deterrence could not support such a sentence because juveniles are less likely to consider possible punishment when making decisions due to their impulsiveness and impetuosity. *Id.* at 72. Regarding incapacitation, the Court stated, "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." *Id.* at 72-73. Stated differently, " 'incorrigibility is inconsistent with youth.' " *Id.* at 73 (quoting *Workman v. Commonwealth*, 429 S.W.2d 374, 378 (Ky. Ct. App. 1968)). Finally, the Court stated that rehabilitation cannot justify a life-without-parole sentence because the penalty "forswears altogether the rehabilitative ideal." *Id.* at 74. Such a judgment is not appropriate in light of juveniles' capacity for change. *Id.* They should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. *Id.* at 79. The Court concluded that an offender's age is relevant to the eighth amendment, and "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.* at 76.

¶ 162    In *Miller*, the Court considered whether the eighth amendment prohibited mandatory life-without-parole sentences for juveniles who commit murder. The Court began by examining two lines of precedent: the categorical ban cases like *Roper* and *Graham*, and capital cases where the Court has required the sentence to consider the characteristics of the defendant and the circumstances of the offense before imposing the death penalty. According to the Court, *Roper* and *Graham* establish that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. Those cases relied on three significant gaps between juveniles and adults. First, juveniles lack of maturity and a developed sense of responsibility. *Id.* at ___, 132 S. Ct. at 2464 (quoting *Roper*, 543 U.S. at 569). Second, juveniles are more vulnerable to negative influences, so they lack the ability to extricate themselves from crime-producing settings. *Id.* at ___, 132 S. Ct. at 2464. Third, juveniles lack well formed and fixed characters, and their actions are not indicative of irretrievable depravity. *Id.* at ___, 132 S. Ct. at 2464. Those were not only supported by common sense, but also by social science. *Id.* at ___, 132 S. Ct. at 2464. The Court noted that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental

traits and environmental vulnerabilities—is crime-specific. *** So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.* at ___, 132 S. Ct. at 2465. In short, "youth matters" in determining the appropriateness of a life-without-parole sentence. *Id*. at ___, 132 S. Ct. at 2465.

¶ 163　　The Court stated that the mandatory penalty schemes there prevented the sentencer from taking account of these central considerations:

> "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at ___, 132 S. Ct. at 2466.

¶ 164　　The Court concluded that mandatory life-without-parole sentences for juveniles violate the eighth amendment (*id.* at ___, 132 S. Ct. at 2469), but insisted that its holding, while flowing from its holdings in *Roper* and *Graham*, was not a categorical bar like those imposed there (*id.* at ___, 132 S. Ct. at 2471). Instead, the Court mandated only that the sentencer consider an offender's youth and its attendant characteristics before imposing such a penalty. *Id.* at ___, 132 S. Ct. at 2471. By treating every juvenile as an adult, the sentencer "misses too much," including the juvenile's chronological age and immaturity, his family and home environment, and his degree of participation in the offense, as well as the fact that he might have been charged and convicted of a lesser offense if not for his own incompetencies—"for example, his inability to deal with police officers or prosecutors *** or his incapacity to assist his own attorneys." *Id*. at ___, 132 S. Ct. at 2468.

¶ 165　　The Court rejected the states' arguments that a national consensus in favor of mandatory life-without-parole sentences for juveniles exists. *Id.* at ___, 132 S. Ct. at 2471. As it did in *Graham*, the Court downplayed the fact that a majority of states allow such sentences. *Id.* at ___, 132 S. Ct. at 2471. "[S]imply counting them would present a distorted view," because most of those states do not have separate penalty provisions for juveniles tried in criminal court and impose penalties regardless of age. *Id.* at ___, 132 S. Ct. at 2471. And the presence of discretion in some states' transfer statutes does not make the consensus stronger because many states use mandatory transfer systems:

> "Of the 29 relevant jurisdictions, about half place at least some juvenile homicide offenders in adult court automatically, with no apparent opportunity to seek transfer to juvenile court. Moreover, several States at times lodge this decision exclusively in the hands of prosecutors, again with no statutory mechanism for judicial reevaluation. And those prosecutorial discretion laws are usually silent regarding standards, protocols, or appropriate considerations for decisionmaking." (Internal quotation marks omitted.) *Id*. at ___, 132 S. Ct. at 2474.

Notably, the Court cited, not approvingly, section 5-130 as one of the automatic transfer statutes. See *id.* at ___ n.15, 132 S. Ct. at 2474 n.15.

¶ 166　　In those three cases, the Court outlined the proper analysis for reviewing the constitutionality of the automatic transfer statute under the cruel and unusual punishment

clause and the proportionate penalties clause. First, the court must consider objective indicia of society's standards, as expressed in legislation across the country regarding automatic transfers. Second, the court must exercise its own independent judgment and consider the culpability of juveniles subject to that provision, the severity of their sentences due to that provision, and the legitimate penological goals behind that provision—that is, how well it serves the state's interest in the four goals that the Supreme Court has recognized as legitimate: retribution, deterrence, incapacitation, and rehabilitation. See *Graham*, 560 U.S. at 71 (citing *Ewing v. California*, 538 U.S. 11, 25 (2003) (plurality op.)).

¶ 167    On the first point, society's standards have changed since 1982, when the General Assembly first passed the automatic transfer statute. As the Supreme Court stated in *Miller*, Illinois is now one of only 14 states with statutes that fail to provide juveniles with an opportunity to seek transfer back to juvenile court, a fact of which the Supreme Court is aware. *Miller*, 567 U.S. at ___ n.15, 132 S. Ct. at 2474 n.15.[1] Additionally, the National Conference of State Legislatures has observed legislative initiatives between 2001 and 2011 that "reflect the trend in states to treat and rehabilitate youth in the juvenile justice system instead of sending them to the more punitive-oriented adult system." Sarah A. Brown, Nat'l Conf. of St. Legislatures, *Trends in Juvenile Justice State Legislation: 2001-2011* 5 (2012), *available at* http://www.ncsl.org/documents/cj/trendsinjuvenilejustice.pdf. See Neelum Arya, Campaign for Youth Just., *State Trends: Legislative Victories From 2005 to 2010 Removing Youth From the Adult Criminal Justice System* 33 (2011), *available at* http://www.campaign foryouthjustice.org/documents/CFYJ_State_Trends_Report.pdf (documenting a trend in 10 states to change transfer laws); see also *People v. Willis*, 2013 IL App (1st) 110233, ¶ 53 ("we see a nationwide trend developing to treat juvenile offenders differently than adult offenders").[2]

¶ 168    On the second point, an exercise of our independent judgment must be informed by *Roper*, *Graham*, and *Miller*. Regarding culpability, every statement that the Court made about juveniles, their psychological traits, and their developmental paths applies with as much force in this case as those. Juveniles, like the defendant, are less culpable than adults. Compared to adults, they lack maturity and a developed sense of responsibility. See *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. Compared to adults, they are more vulnerable to negative influences and outside pressures from family and peers, and have little control over their own environments. See *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. And compared to adults, their characters are not well formed, their traits are less fixed, and their behavior is less indicative of irretrievable depravity or irreparable corruption. *Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464.

---

[1]As *amici* inform us, that number shrinks further in cases involving offenses that correspond with aggravated criminal sexual assault in Illinois because only ten of those states allow automatic transfers for such offenses.

[2]That trend has reached Illinois. A bill to repeal section 5-130 is currently pending in the Illinois House of Representatives. See 98th Ill. Gen. Assem., House Bill 4538, 2013 Sess. The bill, introduced by Representative Nekritz and co-sponsored by seven other legislators, was approved by the House Judiciary Committee in March, and has been re-referred to the House Rules Committee. Clearly, some members of the General Assembly see the need for change.

¶ 169    Those decisions rely not only upon common sense, but also social science. Studies have shown differences in adult and juvenile minds. The transient rashness, proclivity for risk, and inability to assess consequences that mark the latter both lessen juveniles' moral culpability and enhance their prospects for reform. See *Roper*, 543 U.S. at 570; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464-65.

¶ 170    Regarding sentence severity, *Roper*, *Graham*, and *Miller* are not "crime-specific" (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2465), but neither are they sentence-specific. Juveniles are less deserving of harsh punishments (see *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464), particularly when those punishments are mandatory, and the legislature has robbed the sentencer of the ability to consider a juvenile's individual characteristics in assessing whether such a punishment is proportionate to the offense. *Id.* at ___, 132 S. Ct. at 2468 ("*Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult."). That is what the automatic transfer statute does. The constitutional infirmity with the statute is not that it exposes juveniles to adult sentences, but that it operates automatically for those juveniles charged with certain offenses.

¶ 171    I am not suggesting that a categorical ban on all transfers is required. Just as there are conceivable cases in which a life-without-parole sentence for a juvenile is appropriate (see *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469), there are cases in which criminal court is the proper venue and a sentence under the Unified Code of Corrections is clearly appropriate. But, after *Miller*, that determination should be made on an individual basis. In his dissent in *People v. Pacheco*, 2013 IL App (4th) 110409, ¶¶ 98-99 (Appleton, J., dissenting), *appeal allowed*, No. 116402 (Ill. Sept. 25, 2013), Justice Appleton aptly commented:

"While there are juvenile offenders who may, based on the totality of the circumstances, be eligible for adult prosecution, an automatic transfer provision based on age and offense alone, without consideration of the wide variance in the maturity, sophistication, intelligence, and social adjustment of any particular juvenile offender, cannot pass constitutional muster. ***

To be sure, our legislature recognized the increase in violent, homicidal crime committed by juvenile offenders and sought to address that problem. I believe it is the *blanket* transfer based on age that is the flaw in the legislature's response. Such decisions are better made on the circumstances of the offender as well as the offense. In that sense, we should look to both the crime and the nature of the criminal." (Emphasis in original.)

¶ 172    Additionally, I recognize that the sentences available for the felonies enumerated under the automatic transfer statute are not as serious as those addressed by the Supreme Court, at least pursuant to our decision in *People v. Davis*, 2014 IL 115595 (holding that *Miller* applies retroactively). But we should still consider the fact that, if convicted as adults, juveniles are much more likely not only to receive heavier sentences than they would have in juvenile court, but also to receive sentences subject to enhancements and other rules. This defendant is a good example. As a 15-year-old, he was convicted on three counts of aggravated criminal sexual assault, sentenced to three mandatory consecutive 12-year terms for a total term of 36 years' imprisonment, and, under truth-in-sentencing rules, must serve 85% of that term, or 30.6 years. He will be eligible for release after his 45th birthday, and the prospects

of him becoming a useful member of society will be greatly diminished. See also *People v. Jenkins*, 2013 IL App (1st) 103006-U, *appeal allowed*, No. 115979 (Ill. Sept. 25, 2013) (involving an automatic transfer for murder and a 45-year sentence due to a mandatory firearm add-on and truth-in-sentencing rules); *Pacheco*, 2013 IL App (4th) 110409, *appeal allowed*, No. 116402 (Ill. Sept. 25, 2013) (involving an automatic transfer for murder based on accountability, and a 30-year sentence with no good-time credit due to truth-in-sentencing rules); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (holding that lengthy term-of-years sentences are sufficient to trigger "*Miller*-type protections"); *State v. Lyle*, No. 11-1339, 2014 WL 3537026 (Iowa Sept. 30, 2014) (holding that mandatory minimum sentences for juveniles tried in criminal court violate the state constitution's provision against cruel and unusual punishment).

¶ 173    As for the four legitimate penological goals, *Graham* again is instructive. The case for retribution is not as strong for juveniles. Additionally, as early as 1996, one commentator had already criticized the inability of Illinois's transfer provisions to isolate serious offenders, as well as the ineffectiveness of those provisions in sanctioning offenders. Elizabeth E. Clarke, *A Case for Reinventing Juvenile Transfer*, 47 Juv. & Fam. Ct. J. 3, 4 (Nov. 1996). Back then, automatic transfer provisions resulted in criminal court proceedings against minors "who are, more often than not, determined not to be dangerous enough to warrant imposition of a prison term." *Id.* at 19. The statistics have remained largely the same, so that now "[t]he majority of cases automatically transferred end up convicted for lesser offenses, offenses that could not have triggered transfer." See *Automatic Adult Prosecution of Children in Cook County, Illinois. 2010-2012* (Juv. Just. Initiative, Evanston, Ill.), Apr. 2014, at 3, *available at* http://jjustice.org/wordpress/wp-content/uploads/Automatic-Adult-Prosecution-of-Children-in-Cook-County-IL.pdf (hereinafter *Automatic Adult Prosecution*).

¶ 174    Similarly, the case for deterrence is not as strong for juveniles. As early as 1993, this court's own Special Commission on the Administration of Justice (the Solovy Commission) reported that an increasing number of juveniles were transferred to criminal court in the first ten years of the automatic transfer regime without a corresponding deterrent effect, but with a corresponding negative impact on minority children. See Ill. S. Ct. Special Comm'n on the Admin. of Justice, Final Report Part II (December 1993). The Solovy Commission even recommended that the General Assembly consider a "waiver back" provision and an elimination of mandatory minimum sentences for juveniles in automatic transfer cases. *Id.* And those conclusions have only gained support. See Patrick Griffin et al., *Trying Juveniles as Adults: An Analysis of State Transfer Laws and Reporting*, Juv. Offenders & Victims Nat'l Rep. Series (Off. of Juv. Just. & Delinq. Prevention, D.C.), Sept. 2011, at 26, *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/232434.pdf ("the weight of the evidence suggests that state transfer laws have little or no tendency to deter would-be juvenile criminals"); Richard E. Redding, *Juvenile Transfer Laws: An Effective Deterrent to Delinquency?*, Juv. Just. Bull. (Off. of Juv. Just. & Delinq. Prevention, D.C.), June 2010, at 4, *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/220595.pdf ("the bulk of the empirical evidence suggests that transfer laws, as currently implemented, probably have little general deterrent effect on would-be juvenile offenders").

¶ 175    Regarding incapacitation, incarcerating all juveniles charged with felonies enumerated in the transfer statute for lengthy adult sentences is little more than a judgment that they will remain a danger for that entire period, and are essentially incorrigible. Further, the

rehabilitative services available in juvenile detention are at least as helpful as those in the adult prison system. A 2007 study by the federal Center for Disease Control shows that transfer policies generally have had a counter-rehabilitative effect, resulting in increased rates of recidivism, particularly for violent crime, among juveniles sent to adult court as opposed to those kept in juvenile court. See *Effects on Violence of Laws and Policies Facilitating the Transfer of Youth From the Juvenile System to the Adult Justice System*, Morbidity & Mortality Wkly. Rep. (Centers for Disease Control & Prevention, Atlanta, Ga.), Nov. 30, 2007, at 9, *available at* http://www.cdc.gov/mmwr/PDF/rr/rr5609.pdf ("To the extent that transfer policies are implemented to reduce violent or other criminal behavior, available evidence indicates that they do more harm than good."); see also *Automatic Adult Prosecution*, at 3 ("More than 30 years' of studies have consistently demonstrated that categorical treatment of children as adults prevents rehabilitation and positive development, fails to protect public safety, and yields profound racial, ethnic and geographic disparities.").

¶ 176    The majority concludes that the eighth amendment does not apply. The majority is wrong. Criminal procedure laws that fail to take defendants' youthfulness into account at all are flawed. See *Graham*, 560 U.S. at 76.[3] Like the laws involved in *Roper*, *Graham*, and *Miller*, section 5-130 is mandatory and inflexible. Every juvenile who commits one of the enumerated offenses is treated like every adult who commits the same offenses. Transfers are automatic, and the statute contains no mechanism by which a judge can consider characteristics of juveniles before transferring them to criminal court, where, if convicted, they face stiffer adult penalties, enhancements, and other rules to extend their time in prison. To comport with federal and state constitutions, transfer proceedings must take into account how children are different and how those differences may counsel against sending them to criminal court. Here, a judge should have been allowed to consider the defendant's intelligence, his psychological and developmental issues, his family history and status as a ward of the State, as well as any other characteristics that would have aided in making such a determination.

¶ 177    Our state, home of the country's first juvenile court and once a leader in juvenile justice reform, should not be a place where we boast of locking up juveniles and throwing away the key. Illinois should be a place where youth matters, and we work to tailor punishment to fit the offense and the offender, as required by our federal and state constitutions. For juveniles, that starts with abolishing automatic transfers.

¶ 178    I respectfully dissent.

---

[3]The majority cites *City of Urbana v. Andrew N.B.*, 211 Ill. 2d 456, 486 (2004) for the proposition that "[w]hether a defendant is tried in juvenile or criminal court is purely a matter of procedure." *Supra* ¶ 104. But, that proposition comes from Justice Freeman's dissent. More importantly, the majority ignores the breadth of the Court's statement in *Graham*. If, as the majority indicates, transfer statutes are criminal procedure laws, and if criminal procedure laws that fail to consider a defendants' youth are flawed, then, logically, section 5-130, which operates automatically and gives judges no discretion to factor a juvenile's age into the transfer decision, is flawed.